# EXHIBIT CC

DAMIAN HENDRICKS,   February 24, 2009

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

ORIGINAL

----------------------------
DAMIAN HENDRICKS and MICHAEL
MINZIE, individually and on
behalf of other similarly
situated individuals,

                    Plaintiff

VS                                    Civil Action
                                      No: 3:08-cv-613 (JCH)
J.P. MORGAN CHASE BANK, N.A.

                    Defendant

----------------------------


        Deposition of: DAMIAN HENDRICKS, taken
pursuant to Federal Rules of Civil Procedure before
Judi A. Roberts, Licensed Shorthand Reporter, License
No. 325 and Notary Public within and for the State of

Connecticut, held at the offices of Del Vecchio

Reporting Services, LLC, One Landmark Square, 5th

Floor, Stamford, Connecticut, on February 24, 2009

commencing at 9:30 a.m.

```
 1      A.    The recruiter, Jennifer.

 2      Q.    What's her last name?

 3      A.    It's kind of hard to pronounce, Worcester,

 4  something of that sort.

 5      Q.    I take it that you reviewed this before it

 6  was submitted to Cannondale?

 7      A.    I'm not sure.

 8      Q.    Just directing your attention to the portion

 9  of it that describes your position with General

10  Electric, are the statements accurate?

11              MR. HAYBER:   Page 3 going on to page 4?

12              MR. LINTHORST:   Yeah.

13              THE WITNESS:   I need some time to look

14  this over.

15              MR. LINTHORST:   Go ahead.

16              THE WITNESS:   (Witness complying)  Yes,

17  it looks about right.

18  BY MR. LINTHORST:

19      Q.    And then above that, are the statements

20  relating to your employment with J.P. Morgan Hedge

21  Fund Services accurate?

22      A.    Looks about right.

23      Q.    Anything inaccurate?

24      A.    Nothing is jumping out at me at this time as

25  incorrect.
```

DAMIAN HENDRICKS,  February 24, 2009

Page 30

1        Q.    Is it possible that you told them that you
2    were laid off due to a staff reduction?
3        A.    It's possible.  I'm not sure.
4        Q.    Just turning back to what was marked as
5    Defendant's Exhibit 1.  Turning to page 4, a reference
6    to a job with Pepsi Bottling Group.  Are the
7    statements relating to your position with Pepsi
8    accurate?
9        A.    Yes.
10       Q.    Did you perform accounting in this function?
11       A.    Yes.
12       Q.    Just generally what did you do in this
13   position?
14       A.    Well, journal entries.  I can't really
15   remember, but I performed fixed asset functions from
16   capitalizing warehouse assets, journal entries,
17   booking journal entries, preparing monthly reports.
18       Q.    Were you paid overtime in this position?
19       A.    No.
20       Q.    At the time that you left Pepsi did you
21   believe that you should have been paid overtime?
22       A.    No.
23       Q.    Do you believe today that you should have
24   been paid overtime in your position at Pepsi?
25       A.    No.

DAMIAN HENDRICKS,   February 24, 2009

Page 40

1    we wore a name tag saying that we're this or that.

2    BY MR. LINTHORST:

3        Q.    Did you change the title on these job

4    applications to better align your position at G.E. to

5    the position that you were applying to?

6              MR. HAYBER:   Objection to the form of the

7    question.  You can answer it if you understand.

8              THE WITNESS:   No.

9    BY MR. LINTHORST:

10       Q.    Were you ever involuntarily let go by any

11   employer?

12       A.    Involuntarily -- fired, no.

13                  (Deposition Exhibit 4, offered and

14   marked.)

15   BY MR. LINTHORST:

16       Q.    We have marked this document as Defendant's

17   Exhibit 4.  Is this your offer letter for your

18   position with J.P. Morgan Chase?

19       A.    I believe so, yes.

20       Q.    Just looking at the first page -- I'm sorry,

21   just looking at the last page.  Is that your

22   signature?

23       A.    Yes.

24       Q.    Looking at the first page, it indicates that

25   your job title at the time of hire will be fund

DAMIAN HENDRICKS,   February 24, 2009

Page 41

1    accountant specialist, is that correct?

2        A.    Yes.

3        Q.    And was that in fact your job title?

4        A.    Yes.

5        Q.    And was that your job title throughout your

6    employment at J.P. Morgan Chase?

7        A.    Yes.

8        Q.    And you were hired into the financial

9    reporting group, is that correct?

10       A.    Yes.

11       Q.    And you were hired at a salary of 68,000, is

12   that correct?

13       A.    Yes.

14       Q.    Is that the same salary that you held at the

15   time that you resigned your employment?

16       A.    Yes.

17       Q.    And at all points in between?

18       A.    Yes.

19       Q.    Were you paid that salary throughout your

20   employment?

21       A.    Yes.

22       Q.    You were paid the same amount every pay

23   period?

24       A.    Roughly.

25       Q.    Why do you say roughly?

DAMIAN HENDRICKS,  February 24, 2009

Page 48

1      Q.    What direction were they going?

2      A.    The hours worked and the job function.

3      Q.    What about the job function?

4      A.    I didn't feel like it was the right fit for

5    me.

6      Q.    Why not?

7      A.    Because it wasn't the right fit for me

8    because the management styles of the managers weren't

9    what I was looking for, so I felt like I needed to

10   remove myself from that situation.

11     Q.    What was the management style?

12     A.    Micro managing and it got to a point where I

13   could not do -- I could not do good work in their

14   eyes.

15     Q.    Did you leave voluntarily?

16     A.    Um-hm, yes.

17           MR. LINTHORST:  Want to take a break?

18   Off the record.

19           (A recess was taken at 10:32 a.m.)

20           (Deposition resumed at 10:41 a.m.)

21           MR. LINTHORST:  Back on the record.

22   BY MR. LINTHORST:

23     Q.    Now, you testified you were hired, as you

24   put it, as a fund accountant in financial reporting,

25   is that correct?

1       A.   Yes.

2       Q.   And were you in financial reporting your

3   whole employment with J.P. Morgan Chase?

4       A.   Yes.

5       Q.   And you were in the same position of fund

6   accountant the whole time?

7       A.   Yes.

8       Q.   And you worked in Greenwich, Connecticut the

9   whole time?

10      A.   Yes.

11              (Deposition Exhibit 5, offered and

12   marked.)

13   MR. LINTHORST:

14      Q.   Mr. Hendricks, we have marked as Defendant's

15   Exhibit 5 an e-mail exchange between you and Hervey

16   Carvajal dated September 10, 2007.  Just focusing on

17   the first e-mail, is that an e-mail that you sent to

18   Mr. Carvajal?

19      A.   Yes.

20      Q.   And who is Mr. Carvajal?

21      A.   A good friend of mine.

22      Q.   Did you ever work with him?

23      A.   Yes.

24      Q.   Where?

25      A.   Pepsi.

Page 50

```
 1        Q.    Anywhere else?

 2        A.    We were -- we went to college together.

 3        Q.    Okay.  Did he ever work at J.P. Morgan

 4   Chase?

 5        A.    No.

 6        Q.    And are the statements that you made in this

 7   e-mail true?

 8        A.    It's true that I wrote it, yes.

 9        Q.    Okay.  Are the statements that you make in

10   here to Mr. Carvajal true statements?

11        A.    Yes.

12        Q.    Now, the fund accounting group in Greenwich,

13   Connecticut is all within Hedge Fund Services,

14   correct?

15        A.    Repeat that again.

16        Q.    The fund accounting group in Greenwich,

17   Connecticut is all within Hedge Fund Services, is that

18   correct?

19        A.    Yes.

20        Q.    And the work that you do all relates to

21   hedge funds, correct?

22        A.    Yes.

23        Q.    What does Hedge Fund Services in Connecticut

24   do?

25        A.    We provide financial services to hedge fund
```

DAMIAN HENDRICKS,  February 24, 2009

Page 55

```
 1    It's not what he said.
 2              MR. LINTHORST:  Sorry, I'm not trying to
 3    mislead him.
 4              MR. HAYBER:  I think you are.  So just
 5    ask a question without misinterpreting what he said.
 6    BY MR. LINTHORST:
 7        Q.   Did J.P. Morgan Chase buy the middle office
 8    function of Paloma?
 9        A.   I'm not sure.
10        Q.   Do you know what the middle office function
11    is?
12        A.   No.
13        Q.   Do you know what the back office function
14    is?
15        A.   No.
16        Q.   Do you know what fund administration
17    services are?
18        A.   No.
19        Q.   Now, throughout your employment at J.P.
20    Morgan Chase the fund accounting group in Greenwich,
21    Connecticut was divided into three groups, correct?
22        A.   They were divided but I can't name the three
23    groups.
24        Q.   Well, you were in financial reporting,
25    correct?
```

```
 1        A.   Yes.
 2        Q.   And there was portfolio accounting, correct?
 3        A.   Yes.
 4        Q.   And there's a third group but you don't know
 5   what the name of it is?
 6        A.   No.
 7        Q.   Is it called corporate accounting?
 8        A.   Yes, now I remember.
 9        Q.   And it was divided up that way throughout
10   your employment at J.P. Morgan Chase, correct?
11        A.   Yes.
12        Q.   And each of the groups has a different
13   function?
14        A.   Yes.
15        Q.   And what does portfolio accounting do?
16        A.   I'm not sure.
17        Q.   Do they book entries?
18        A.   Yes, I think so.
19        Q.   Do they have monthly closes?
20        A.   Yes, I think so.
21        Q.   Anything else that you know of?
22        A.   They have monthly closes and they book
23   entries.
24        Q.   Anything else?
25        A.   Not that I can think of at this moment.
```

1          Q.    You did not do those things in your position

2    at J.P. Morgan Chase, correct?

3          A.    I did not book entries and we did not have

4    monthly closes.

5          Q.    Is there anything that portfolio accounting

6    did -- is there anything that the fund accountants in

7    portfolio accounting did that you also did as a fund

8    accountant in financial reporting?

9          A.    We use the same system, Geneva.

10         Q.    Anything else?

11         A.    We run reports out of Geneva and we both

12   facilitate services to our clients.

13         Q.    But you're providing different services,

14   correct?

15         A.    I mean, on a ship somebody may swab the

16   deck, somebody may paint but we're all sailors, so

17   yes.

18                MR. LINTHORST:   Would you read my

19   question back.

20                (The question was read as requested)

21   BY MR. LINTHORST:

22         Q.    Is that correct?

23         A.    Yes.

24         Q.    And the fund accountants in portfolio

25   accounting have different job responsibilities than

DAMIAN HENDRICKS,   February 24, 2009

Page 58

1    you did in financial reporting, correct?

2         A.    Repeat that.

3         Q.    The fund accountants in portfolio accounting

4    had different job responsibilities than you had in

5    financial reporting, correct?

6              MR. HAYBER:   Objection to the form of the

7    question.

8              THE WITNESS:   Yes.

9    BY MR. LINTHORST:

10        Q.    And your knowledge of J.P. Morgan Chase and

11   what different individuals may have done in the

12   performance of their job, I take it, is limited to the

13   time that you worked there, correct?

14        A.    Repeat that again.

15        Q.    You don't know what people did as fund

16   accountants before you arrived and started your

17   employment at J.P. Morgan Chase, correct?

18        A.    No.

19        Q.    And you don't know what they do or have done

20   since you left, correct?

21        A.    No.

22        Q.    You don't know?

23        A.    I don't know.

24        Q.    What does corporate accounting do?

25        A.    I don't know.

1          Q.    No idea?

2          A.    No.

3          Q.    Do you know what the job responsibilities of

4     a corporate accountant are -- of a fund accountant in

5     corporate accounting?

6          A.    Specific job function, no.

7          Q.    General job function?

8          A.    General job function, that we provide a

9     service to hedge fund clients.

10         Q.    Do you know any more specifically than that?

11         A.    No.

12         Q.    What corporate accounting did while you were

13    at J.P. Morgan Chase was different than what financial

14    reporting did, correct?

15               MR. HAYBER:   Objection to the form of the

16    question.

17               THE WITNESS:   I don't know.

18    BY MR. LINTHORST:

19         Q.    The job responsibilities of a fund

20    accountant in corporate accounting were different than

21    the job responsibilities you had in financial

22    reporting, correct?

23               MR. HAYBER:   Objection to the form of the

24    question.

25

Page 60

```
 1                MR. LINTHORST:  What's your objection?
 2                MR. HAYBER:  You really want me to put it
 3      on the record?
 4                MR. LINTHORST:  Yeah.
 5                MR. HAYBER:  Sure.
 6                MR. LINTHORST:  Okay.
 7                MR. HAYBER:  Never mind.
 8                MR. LINTHORST:  Do you understand the
 9      question?
10                THE WITNESS:  No.
11      BY MR. LINTHORST:
12           Q.   Do you know what the job responsibilities of
13      a fund accountant in corporate accounting were at the
14      time that you worked at J.P. Morgan Chase?
15           A.   No.
16           Q.   What did financial reporting do at the time
17      that you worked there?
18           A.   At the time that I worked there we did
19      financial reporting, meaning financial statements,
20      prospectus editing, just putting together the whole
21      financial statement, various management schedules,
22      17H, a few things that I've forgotten.
23           Q.   But you did all of those things you just
24      mentioned?
25           A.   Yes.
```

Page 68

1        A.    I'm not sure.

2              MR. HAYBER:  Are you referring to funds

3    that he worked on?

4              MR. LINTHORST:  Yes.

5    BY MR. LINTHORST:

6        Q.    Were some funds more complex than others that

7    you worked on?

8        A.    Yes.

9        Q.    What made them more complex?

10       A.    Well, depends on, like I said, the different

11   strategies of like, for instance, just classification

12   of derivatives and so forth, yeah, things like that

13   would make them very complex.

14       Q.    So the type of investment could make the

15   accounting classification of its investment activity

16   more complex, correct?

17       A.    Yes.

18       Q.    I take it hedge funds are more complex than

19   mutual funds?

20       A.    Yes.

21       Q.    As it relates to the accounting for them?

22       A.    Yes.

23       Q.    Are hedge funds less regulated than mutual

24   funds?

25       A.    Again, that's a question that I am not able

DAMIAN HENDRICKS,   February 24, 2009

Page 81

1      Q.   Of course the clients, the hedge fund
2  clients, I take it, are very important to J.P. Morgan
3  Chase?
4      A.   The hedge fund clients, yes.
5      Q.   Do you know how much J.P. Morgan Chase
6  charges for preparing the financial statement?
7      A.   I'm not privy to that information, no.
8      Q.   Do you know how much J.P. Morgan Chase
9  charges for the other accounting services it provides
10  to hedge funds?
11      A.   No.
12      Q.   You prepared the financial statements for
13  the hedge fund you worked on consistent with U.S.
14  GAAP?
15      A.   Repeat that question.
16      Q.   You prepared the financial statements for
17  the hedge funds you worked on consistent with U.S.
18  GAAP?
19      A.   Yes.
20      Q.   I take it knowledge of U.S. GAAP was a
21  requirement for this position?
22      A.   You have to know what it is and the basic
23  knowledge, yes.
24      Q.   And you did know that, correct?
25      A.   Yes.

DAMIAN HENDRICKS,  February 24, 2009

Page 166

1    this is how we've been doing it for ions, so we're

2    going to leave it at that, we're not going to make

3    these our 13th-hour changes, so take it or leave it.

4         Q.   But the ones that it was determined they

5    would make, it was up to you to make them?

6         A.   Yes.

7         Q.   I take it every financial statement is

8    different?

9         A.   Numbers-wise?

10        Q.   Different data?

11        A.   Different data.

12        Q.   Different economic activity by the fund?

13        A.   Yes.

14        Q.   Different types of funds?

15        A.   You might have some slight structural

16   changes.

17        Q.   Different types of investments?

18        A.   Yes.

19        Q.   Different client requirements?

20        A.   Yes.

21        Q.   Some clients would want data classified a

22   certain way whereas others might not?

23        A.   Yes.

24        Q.   Different auditors?

25        A.   Yes.

DAMIAN HENDRICKS,  February 24, 2009

Page 167

1    Q.   And all of these things I take it would
2   impact what you needed to do to put the financial
3   statement together?
4    A.   Yes.
5    Q.   I take it that there's more than one way to
6   prepare a financial statement?
7    A.   I don't know.
8    Q.   Well, if you gave the financial statement to
9   two different people, do you think you'd end up with
10  the same classifications from the data?
11   A.   Absolutely.
12   Q.   Were there timelines and deadlines for the
13  preparation of the financial statement?
14   A.   Yes.
15   Q.   Did you have any input into those?
16   A.   No.
17   Q.   Any ability to adjust?
18   A.   No.
19   Q.   I take it the job required different things
20  at different times of the year, correct?
21   A.   What do you mean by that?
22   Q.   Was it busier at some times than other
23  times?
24   A.   Yes.
25   Q.   What is audit season?

DAMIAN HENDRICKS,  February 24, 2009

Page 194

1      Q.   It just changed?

2      A.   Well, it changed -- it doesn't change in

3   volume but it changes in task, if that's the right way

4   of putting it.

5      Q.   Sure.  It depends on the time of the year

6   you would be doing different tasks?

7      A.   Yes, cross functioning.

8      Q.   What percentage of your time during your

9   employment was spent preparing financial statements?

10     A.   What percentage?

11     Q.   Yeah.

12     A.   I'd say probably about 75 percent, and this

13   is an approximation for the record because this is

14   arbitrary because they might do scientific and found

15   out that I did less or more.

16     Q.   Just asking for your --

17          MR. HAYBER:  You mean, as opposed to the

18   other reports that he might work on?

19          MR. LINTHORST:  Well, I mean, the

20   financial statement and all of the reports that that

21   encompasses.

22          THE WITNESS:  I'd say 85 percent of my

23   time.

24   BY MR. LINTHORST:

25     Q.   Does that include other reports like a 17H

Page 195

1    and pro forma?

2         A.    Not for the financial statement, no.

3         Q.    So the 85 percent is just the financial

4    statement?

5         A.    Yes.

6         Q.    Does that include the whole audit query

7    process?

8         A.    Yes, it depends if it's a year end or

9    something we might get an audit request.  Once that is

10   submitted, then they started doing their review and

11   they start sending their requests.

12   BY MR. LINTHORST:

13        Q.    I mean, your 85 percent includes the audit

14   requests, audit query process?

15        A.    Yes, I have to say that, yes.

16        Q.    And your client interaction as it relates to

17   the financial statement, it includes that as well?

18        A.    Yes.

19        Q.    What's the other 15 percent?

20        A.    Well, we're doing 17H, we're doing pro

21   formas, income statement, monthly income statement, I

22   think, for another client.

23        Q.    I take it preparing the financial statement

24   was the most important part of your job?

25        A.    It's why the department existed.

1       A.    Yes.

2       Q.    Now, I take it when we focus on this period

3    in the last three months of your employment where you

4    say the views of managers -- the views that managers

5    had of your performance changed, you did not agree

6    with those views?

7       A.    No, I thought I was unfairly treated.  Like

8    I said before, I listened, because I was in close

9    proximity to two managers, and I would listen to their

10   review of other fund accountants' work and it's

11   similar mistakes but my mistakes would be deemed -- I

12   even said to Carolyn one time when we had a meeting, I

13   said, I feel like I can't do anything right nowadays.

14   And I used this analogy.  I said, it's like putting a

15   band-aid over an amputated leg.  There's no way I can

16   ever produce quality work here because the unfairness

17   has already started.  And she said that she was going

18   to talk to the managers about it.  I don't know if she

19   did or didn't, I'm not going to say that.  But I just

20   felt like there's nothing I could do.  Same mistakes

21   other -- human element that I spoke about -- other

22   fund accountants would make, and it would just be like

23   make this but my mistakes would be elevated to

24   Carolyn.

25      Q.    Is this when you say you started being

1    micromanaged?

2          A.   Yes.

3          Q.   And did you get a below expectation rating

4    for your year end review?

5          A.   I think I got a needs improvement.

6          Q.   I'm sorry, needs improvement?

7          A.   Yeah.   I don't know how I went from a meets

8    to a needs improvement.

9          Q.   Because to you your work product was still

10   of the same quality where you got the meets?

11         A.   The same quality.   I mean, not still of the

12   same quality because in the year end I was new, and in

13   the mid year I was new, fairly new, and in the year

14   end I was there for some time, so I wouldn't say.   But

15   I'd just say that my work was on par with the other

16   fund accountants or most of them in the group, but I

17   was given harsher and my mistakes were elevated to

18   upper management.

19         Q.   Do you know what ratings your colleagues in

20   financial reporting got?

21         A.   No.

22         Q.   Do you know whether they got a bonus?

23         A.   I'm not privy to that information.

24         Q.   Do you know whether they got a raise?

25         A.   I'm not privy to that information, that's

Page 205

1    Jennifer, Fabiola, and did I say Jennifer?

2         Q.   Jennifer, N'Tembi and Fabiola?

3         A.   Yes.

4         Q.   Okay.   What were the differences in their

5    way of doing things?

6         A.   I mean, simple example, one, because I

7    worked with all three, one would say, for instance,

8    Jennifer would say, you know, you need support for

9    this.  And then the next time when you work with

10   N'Tembi and you don't find you have the support for

11   it, then N'Tembi would look at you like and say, why

12   don't you have the report for -- I'm just saying,

13   there weren't any consistency among the disclosures or

14   support system or whatever.  There weren't

15   consistencies so you have to just go with the flow and

16   that sometimes breeds confusion among the group and I

17   think we did express that to Carolyn, that was one of

18   our concerns.

19        Q.   Did they have different management styles?

20        A.   I'd say so, yes.

21        Q.   In what way?

22        A.   Just N'Tembi was more for authoritarian and

23   Jennifer was more for micro manager.  I can only give

24   you my experience with them.

25        Q.   So in your experience with them, Jennifer

```
 1    managed you closer than the others?
 2         A.    Really close.
 3         Q.    But more close than the others?
 4         A.    Yes.
 5         Q.    And that affected what you did?
 6         A.    It affected me because I was concentrating
 7    on not making any mistakes as opposed to concentrating
 8    on -- I mean, when you know that there's nothing you
 9    can do that's going to be looked at favorably, I don't
10    know how a person can gather the motivation to -- even
11    Carolyn said to me when I talked to her, she was like,
12    I understand how you must feel, and I believe, this is
13    not verbatim but I'm paraphrasing, she said to me that
14    I couldn't work in your condition.
15         Q.    She wasn't -- Jennifer was not letting you
16    do as much in terms of the performance of your job as
17    the others were?
18         A.    No.
19         Q.    And during this period in the last three
20    months of your employment where you felt like you were
21    being micro managed, you felt like you were being
22    managed closer than your colleagues?
23         A.    Yes.
24         Q.    And so you weren't during that period being
25    allowed to do as much in the performance of your
```

DAMIAN HENDRICKS,   February 24, 2009

Page 211

1    possibilities and you need the manager's assistance.

2         Q.   So before you went to the manager you did

3    everything you could to figure it out on your own?

4         A.   Yes.

5         Q.   Did you hire anyone as part of your job

6    duties at J.P. Morgan Chase?

7         A.   No.

8         Q.   Did you interview anyone who was an

9    applicant for a job?

10        A.   No.

11        Q.   Did you prepare performance reviews for

12   others?

13        A.   No.

14        Q.   Did you review the work of others?

15        A.   No.

16        Q.   Did you discipline other employees?

17        A.   No.

18        Q.   Did you train other employees?

19        A.   No.

20        Q.   Did you coach or mentor other employees?

21        A.   No.

22        Q.   Was anyone escalating issues to you?

23        A.   No.

24        Q.   Did you have any investment operations

25   duties?

DAMIAN HENDRICKS,   February 24, 2009

Page 212

```
 1        A.    Investment operations duties, I don't know
 2   what that means.
 3        Q.    Did you make recommendations for
 4   departmental procedures?
 5        A.    No.
 6        Q.    Did you evaluate internal controls?
 7        A.    No.
 8        Q.    Did you provide feedback and resolution on
 9   risk areas?
10        A.    No.
11        Q.    Did you create, maintain and update
12   procedures for the funds?
13        A.    No.
14        Q.    Were you involved in client onboarding?
15        A.    No.
16        Q.    Did you work with anyone who was responsible
17   for new business?
18        A.    No.
19        Q.    Did you identify areas of inefficiency and
20   recommend improvements?
21        A.    No.
22        Q.    Did you work with legal and compliance to
23   insure that funds you worked with were in compliance
24   with relevant regulatory authorities?
25        A.    No.
```

DAMIAN HENDRICKS,   February 24, 2009

Page 213

```
 1        Q.    Did you make suggestions for procedural
 2   changes?
 3        A.    No.
 4        Q.    Did your position at Chase require you to be
 5   pro-active?
 6        A.    Yes.
 7        Q.    Did your position at Chase require you to be
 8   a problem solver?
 9        A.    Yes.
10        Q.    Did you assist with the initial set-up of
11   the fund accounting function?
12        A.    Initial set-up of fund accounting, what does
13   that mean?
14        Q.    Did you help set up that function?
15        A.    No.
16        Q.    At J.P. Morgan Chase?
17        A.    No.
18        Q.    Did you define the structure and processes
19   of the fund accounting function?
20        A.    No.
21        Q.    Did you assign work to others?
22        A.    No.
23        Q.    Did you assign others in financial reporting
24   to work on particular financial reports?
25        A.    No.
```

Page 214

1      Q.   Did you stream line operational processes to
2  reduce risk and improve efficiency?
3      A.   No.
4      Q.   As part of your job did you insure that the
5  technology that was available was being utilized in
6  the most efficient manner?
7      A.   No.
8      Q.   Did you work with technology to resolve any
9  issues and improve processes?
10     A.   No.
11     Q.   Did you monitor work flow?
12     A.   No.
13     Q.   Did you handle trade processing and
14  reporting?
15     A.   No.
16     Q.   Did you have any trade review
17  responsibilities?
18     A.   No.
19     Q.   Did you have any anti money laundering
20  responsibilities?
21     A.   We all did.  We had to take a course on anti
22  money laundering type stuff, we were all expected to,
23  I mean, we're a bank.
24     Q.   So what was your responsibility?
25     A.   Well, just to make sure you didn't try to

DAMIAN HENDRICKS,  February 24, 2009

Page 215

1    launder money while you were at the bank.

2         Q.   So was the issue that you shouldn't launder

3    money or were you expected to keep an eye out to make

4    sure nobody was laundering money?

5         A.   Both.

6         Q.   Anything else?

7         A.   No, that's it.

8         Q.   You did not interact with fund investors,

9    correct?

10        A.   No.

11        Q.   And you did not have any job

12   responsibilities relating to fund investors?

13        A.   No.

14        Q.   Did you work with other groups to set

15   internal deadlines?

16        A.   No.

17        Q.   Did you determine daily prices and yields?

18        A.   No.

19        Q.   Did you communicate ideas and contribute to

20   the development of the department?

21        A.   No.

22                   (Deposition Exhibit 27, offered and

23   marked.)

24   BY MR. LINTHORST:

25        Q.   Is this an accurate reflection of your

DAMIAN HENDRICKS,  February 24, 2009

Page 219

1        Q.    Do you consider individuals who are called

2   fund accounting associates to fall into that category?

3        A.    Like I said, we didn't walk around calling

4   our name fund accountant associates.  We were known to

5   me as fund accountants and we performed the same

6   function, bottom line function, which is to produce

7   the financial statement to the clients.

8        Q.    Do you know whether they have a financial

9   reporting group in Boston?

10       A.    I don't know.  I don't know.  They might

11  have.

12       Q.    Are you seeking to proceed on behalf of the

13  fund accounting analysts or senior analysts?

14       A.    Yes.

15       Q.    Do you consider the supervisors to be part

16  of the class?

17       A.    No.

18       Q.    You wouldn't consider any one of your

19  supervisors to be part of the class?

20       A.    No.

21       Q.    Why not?

22       A.    Because they had to exercise judgment and

23  discretion and they are involved in the interview

24  process, they're involved in hiring, recommendations

25  on terminations and so forth.

DAMIAN HENDRICKS,  February 24, 2009

Page 221

1    accountants -- I have actually seen instances where

2    they have come down to our offices, and I'm sure they

3    perform the same function.

4         Q.    Based on what?

5         A.    Based on the job description.  I've only

6    seen one job description for fund accountants

7    everywhere.

8         Q.    Where did you see that job description?

9         A.    On line.

10        Q.    Is that the job description that you

11   produced to us?

12        A.    I think so, yeah.

13        Q.    That's the only job description you've ever

14   seen for fund accountant?

15        A.    Yes.

16              (Deposition Exhibit 29, offered and

17   marked.)

18              MR. LINTHORST:  Off the record.

19              (A recess was taken at 4:05 p.m.)

20              (Deposition resumed at 4:12 p.m.)

21              MR. LINTHORST:  Back on the record.

22   BY MR. LINTHORST:

23        Q.    Mr. Hendricks, we've marked as Defendant's

24   Exhibit 29 a document you produced to us.  Is that the

25   job description that you testified to just before the

```
 1   break?
 2              MR. HAYBER:  I mean, I'll stipulate that
 3   it has at the bottom of it P77, that's a plaintiff's
 4   docket control number that we attached to it.  I mean,
 5   if that's what you want to know, if we gave it to you.
 6   I don't know whether it's the one he was referring to.
 7              MR. LINTHORST:  Well, that's my question.
 8              THE WITNESS:  Yes, I think so.  Well, for
 9   the record, when I started my employment I did not get
10   a job description, I had to actually look for this,
11   that's why.
12   BY MR. LINTHORST:
13      Q.   And is this document the basis for your
14   statement that fund accountants in FHS in Boston --
15      A.   Yes, this is the basis --
16              MR. HAYBER:  Let him finish his question
17   completely.
18   BY MR. LINTHORST:
19      Q.   -- perform the same job responsibilities as
20   you did?
21      A.   Yes.
22      Q.   Anything else?
23      A.   Other than the fact that we all produce the
24   same product.
25      Q.   How do you know that?
```

1              (Deposition Exhibit 30, offered and

2     marked.)

3     BY MR. LINTHORST:

4          Q.    Did you ever see a notice similar to the one

5     that we have marked as D30 in the work place or the

6     lunch room at J.P. Morgan Chase when you worked there?

7          A.    Yes, in the kitchenette.

8          Q.    You saw it?

9          A.    Yes.

10         Q.    Was it there throughout your employment?

11         A.    Yes.

12         Q.    Looking at paragraph 19 of the complaint.

13    You did not maintain the hedge fund books and records,

14    did you?

15         A.    Maintain the hedge fund books, no.

16         Q.    What does preparation and review of fund and

17    management financial statements -- I understand what

18    a, I guess a fund financial statement is, but what's a

19    management financial statement?

20         A.    I don't know what that is.

21         Q.    What are the company guidelines that are

22    referenced there, if you know?

23         A.    I guess the way -- I don't know, I'm not

24    going to interpret this.  I don't know.

25         Q.    You're not aware of company guidelines that

DAMIAN HENDRICKS,  February 24, 2009

Page 229

1    apply to your preparation of financial statements?

2         A.    There are -- nothing formal written, just

3    tribal knowledge, if that's the case.  Just what was

4    told to us, like this is the way it's supposed to be

5    done.

6         Q.    By the supervisors?

7         A.    Yes.

8         Q.    Just as you're working with them?

9         A.    Yes.

10        Q.    To your knowledge, did all of the fund

11   accountants working in Greenwich have a Bachelor's

12   Degree in accounting?

13        A.    No.  I believe -- no.

14        Q.    Who didn't have a Bachelor's Degree in

15   accounting?

16        A.    I believe Miguel Zablah has a finance.

17        Q.    Bachelor's Degree in finance?

18        A.    Yes.

19        Q.    Anybody else?

20        A.    No, not that I can think of.

21        Q.    Do you know whether the fund accountants in

22   Boston have --

23        A.    No.

24        Q.    -- all have accounting degrees?

25        A.    No.

DAMIAN HENDRICKS,   February 24, 2009

Page 232

1        Q.    He transferred outside of fund accounting?

2        A.    Yes.

3        Q.    And do you know what his job duties were

4    when he was in fund accounting?

5        A.    As he was in portfolio.

6        Q.    Do you know what that means in terms of what

7    he did?

8        A.    Not every detail.

9        Q.    Generally?

10       A.    He would have produced a product that J.P.

11   Morgan provided for the clients.

12       Q.    Do you know anything more specific than

13   that?

14       A.    No.

15       Q.    He had different job duties than you had,

16   correct?

17       A.    Yes.

18       Q.    You submitted a declaration in this case, is

19   that right?

20       A.    I don't know what that is.  Can I see it?

21       Q.    A signed statement.  Take a quick look at my

22   copy, I don't have a copy for you.  Is that right?

23       A.    Yes.

24       Q.    And that's your signature?

25       A.    Yes.

DAMIAN HENDRICKS,   February 24, 2009

Page 241

1          Q.    What's the basis for you saying you're in a

2    management position?

3          A.    My title.

4          Q.    Anything else?

5          A.    What I've stated before, that I don't really

6    work past my time, rarely work past my time.

7          Q.    I'm just going back to Defendant's

8    Exhibit 1.  It starts on what's Bates numbered at the

9    bottom page 12.  On page 13 you filled out some

10   information about your employment at J.P. Hedge Fund

11   Services, is that correct?

12         A.    Page what?

13         Q.    Thirteen.

14         A.    Yes.

15         Q.    You indicate that your starting rate and

16   final salary were both $80,000, is that correct?

17         A.    Yes.

18         Q.    And that's not true, right?

19         A.    No.

20         Q.    In fact, it was 68,000, right?

21         A.    Yes.

22         Q.    Why did you put 80,000?

23         A.    Well, it's like an unwritten rule where the

24   recruiter would say in order to get a raise from what

25   you're making, to put your salary a little higher.

1    Everybody does it.

2         Q.   So you felt like you if gave them this

3    information they would pay you more?

4         A.   Yes.

5         Q.   And if you had told them that you were

6    making 68,000 they probably would not have offered you

7    eighty-two five?

8         A.   Yes.

9         Q.   And I take it they don't know today that

10   that information is not correct?

11        A.   No.

12        Q.   But you understood when you filled it out

13   that you were obligated as a condition of your

14   employment to provide truthful information?

15        A.   Yes.

16                       (Deposition Exhibit 32, offered and

17   marked.)

18   BY MR. LINTHORST:

19        Q.   At some point in this case did you obtain an

20   application, the application that you filled out for

21   Cannondale?

22        A.   Say again.

23        Q.   At some point in this case in order to

24   produce it to us did you obtain the application that

25   you submitted for Cannondale?

Page 243

1     A.   I might have.

2     Q.   Did you?

3     A.   I might have.  I don't remember.

4     Q.   Where would you have obtained that from?

5     A.   Where would I?  I guess H.R.

6     Q.   From Cannondale?

7     A.   Um-hm.

8     Q.   Do you think you did?

9     A.   I might have.  I'm not sure.

10    Q.   This was produced to us, it's got

11   Plaintiff's Bate No. 111 through 113 or 114.

12    A.   Um-hm.

13    Q.   Did you provide this to your attorneys?

14    A.   Yeah, yeah.

15    Q.   And is this what you think you got from

16   H.R.?

17    A.   I think it is, yeah.

18    Q.   Did you keep a copy or did you give the only

19   copy you got to your attorneys?

20    A.   I don't remember what copies I have, to be

21   honest.

22    Q.   So you may have copies of this in your

23   personal possession?

24    A.   Or I may not.

25    Q.   Or you may not?

Page 244

1        A.    Um-hm.

2        Q.    Did you make any changes to it before you

3   gave it to your attorneys?

4        A.    I may have.

5        Q.    What changes did you make?

6        A.    Can I compare them?

7        Q.    Well, just based on your recollection, do

8   you recall making any changes?

9        A.    Yeah, the salary.

10       Q.    So after you obtained this from Cannondale

11   H.R. you made a change to page 2 of the application to

12   remove the salary that you indicated to Cannondale

13   that you were making at J.P. Morgan Chase, is that

14   right?

15       A.    Yeah, I might have, yeah.

16       Q.    Well, did you?

17       A.    I might have.

18       Q.    Why?

19       A.    Because I didn't think it was relevant.

20       Q.    Why not?

21       A.    I just made a judgment.  It may have been

22   that I just didn't think it was relevant to the case.

23       Q.    So did you decide in the documents that you

24   were producing to make any other changes?

25       A.    No.  I don't think I made any, no.

```
 1         Q.    Isn't it true that you removed this
 2    information so that we would not see that you had
 3    submitted false information no Cannondale?
 4         A.    It's possible.
 5         Q.    Well, isn't that the reason?
 6         A.    Yes.
 7         Q.    And you did not indicate anywhere on here
 8    that you removed the information, correct?
 9         A.    No, I didn't think I had to.
10         Q.    And you did not advise your attorneys that
11    you had removed the information, correct?
12         A.    No, it slipped me.
13         Q.    Was it just a slip or did you not want your
14    attorney to know?
15         A.    No, it slipped me.  I wanted my attorney to
16    know everything that I do pertaining to this case.
17         Q.    Well, we would request that you engage in a
18    search for the original that you received from H.R.
19    and we'd like to take a look at it.
20               Is there any other information that you
21    submitted to Cannondale that is not true?
22         A.    No.
23         Q.    Looking back at Defendant's Exhibit 5.
24               MR. HAYBER:  Which one is this, 32?  The
25    one we were just looking at, Tom, is 32?  Five, is
```

# EXHIBIT DD

# Bohan &
# Bradstreet, Inc.

Professional Search and Recruitment – Staff through Executive Level

Accounting/Financial • Information Technology • Engineering/Manufacturing • Human Resources • Sales/Marketing

February 28, 2008

Ms. Kathy Stevens
Human Resource Generalist
CANNONDALE BICYCLE CORPORATION
16 Trowbridge Drive
Bethel, CT 06801

BOHAN & BRADSTREET has personally interviewed and is confidentially submitting the profile of:

### DAMIAN J. HENDRICKS

For the position of:   **SENIOR ACCOUNTANT**

Accountant groomed by GE with strengths in financial reporting, consolidations, month-end close, fixed assets, G/L analysis, financial and ad hoc analysis and excellent knowledge of Sarbanes-Oxley. While at GE was liaison to the Sarbanes-Oxley technical advisory group for his department.   Has Hyperion and advanced Excel skills including v-look ups and pivot tables. Diligent, hard-working individual with strong drive. Currently seeking higher level of challenge. Lives in New Milford.

*Edward B Bradstreet*

Edward B. Bradstreet, CPC

If this candidate is hired for either the above position, in your company or affiliations, in a contract management role or as a consultant for any other position mutually agreed upon due to this referral and/or profile, then BOHAN & BRADSTREET's fee and guarantee policy will be immediately in effect.

741 Boston Post Road, Suite 101, Guilford, CT  06437
(203) 453-5535 • Fax (203) 453-5545 • www.bohan-bradstreet.com

**DEFENDANT'S EXHIBIT**
*1*
2/24/09

Cannon-000002

# Bohan &

# Bradstreet, Inc.

Professional Search and Recruitment – Staff through Executive Level

Accounting/Financial • Information Technology • Engineering/Manufacturing • Human Resources • Sales/Marketing

## DAMIAN J. HENDRICKS

PROFESSIONAL EXPERIENCE

**JPMorgan Hedge Fund Services**                                                   Greenwich, CT
*Financial Reporting Analyst*                                                      March 2007 – Present

- Responsible for preparing interim and year-end financial statement for multiple hedge fund clients with master and feeder structures. Financial Statements include: Balance Sheet, Income Statement, NAV Summary, Schedules of Investment, Net Change in Assets, Financial Highlights and Cost Roll Forwards.
- Prepare monthly Proformas, quarterly balance sheet and income statement consolidations. Process quarterly 17H reports and year end packages.
- Prepare budget schedules and maintain rate of return schedules.
- Prepare management/investors' reports including ad hoc schedules and partnership share class allocations.
- Liaison with multiple departments in the organization such as Onboarding, Pricing, OTC, Portfolio Accounting, and Corporate Actions to ensure timely processing of clients' schedules.
- Work with external auditors throughout the audit process. Ensure timely processing of audit confirms to assist auditors during the audit process, answer all inquiries in a timely manner and oversee timely preparation of all schedules requested.

**General Electric– GE Commercial Financial Services (CFS)**                      Norwalk, CT
*Senior Financial Analyst*                                                        February 2005 – March 2007

- Reported to the North American Controller and responsible for financial reporting, financial analysis Sarbanes Oxley testing and ad hoc reporting for four business segments generating $30B in revenue. Supported GE Corporate and related Business Segments, to drive controllership and ensure accurate and timely accounting and financial reporting, in compliance with US GAAP.
- Prepared quarterly Airline Exposures, for all the Business Segments (GMC, CL, GSF and BLG used for disclosure in Investor Relations Book and GE/GECS/GECC 10-Q; this was reported to the SEC.
- Prepared Capital Parts and Services (Joint Venture) quarterly Financial Statements and the quarterly IBM / Mellon Deferred Credit Schedules.
- Analyzed OTC Schedules, Balance Sheet, Cash Flows, Business Shares, Syndication Skims, Specific Reserves, Write-offs and Restructures.
- Processed journal entries in Oracle general ledger.  Served as principal source of information on rules and procedures concerning AP and AR.
- Ensured timely payment to vendors, processed payments, helped to maintain general ledgers and negotiate past due accounts. Processed check deposits.
- Prepared Non Earning Assets, Schedule A (Non-Securitized Loans) and Discounts and Premiums Amortization schedules and analyze monthly Distressed Debt Schedule for all the Business Segments.

Cannon-000003

# Bohan &
# Bradstreet, Inc.

Professional Search and Recruitment – Staff through Executive Level

Accounting/Financial • Information Technology • Engineering/Manufacturing • Human Resources • Sales/Marketing

*Damian J. Hendricks, page 2*

- Liaison with the Technical Advisory Group in the Sarbanes Oxley (SOX 404) process, in areas of FSG/OTC Reporting, Inbound Sub Ledger Feeds, System Maintenance and Terminations. Responsible for:
  - Performing walkthroughs of applicable processes and updating process maps as necessary.
  - Assessing risks related to financial reporting and identifying control activities in place to address those risks.
  - Ensuring that applicable tests plans were properly executed, tests results were properly evaluated and any related deficiencies were properly remediated where necessary, in accordance with PCAOB standards.
- Lead specialized projects including the Canadian Re-organization to ensure accurate reporting of participation assets and income on Canadian books.
- Participated in acquisition activities related to the $220MM portfolio acquisition by CFS from Citi Group and reconciled all portfolio accounts as of the acquisition date.
- Liaison with Operations and FP&A and assisted with sub ledger conversion (ABLE to ACBS).
- Created Standard Operating Procedures for Distressed Debt, Airline Exposures and Portfolio Processes, which creates a process to train new and existing employees in the event of staff turnover.
- Knowledge of FAS 114 and 118 related to Impairments and Specific Reserves and FAS 91 related to Deferred Fees.
- Responsible for reviewing and approval of account reconciliation schedules prepared by the CFS India team located in Jaipur, India.
- Lead the finance team in operations relating to Oracle Implementation.

**Pepsi Bottling Group (PBG)**                                    Somers, NY
*Fixed Assets Accountant*                          June 2004 – February 2005
- Processed Fixed Asset activities through the various subsystems, preparation and delivery of Journal Entries in Oracle and reconciliations, management schedules and analysis.
- Contributed in meeting PBG's Capital Reporting commitments.
- Partnered with field managers to provide total financial support.
- Prepared reconciliations, and schedules for two major Business units. (Southern California and The Pacific Northwest)

**New York Army National Guard (NYARG)**              Bronx, New York
**Gunner (Field Artillery)**                    August 2000 - September 2002
- Processed and oriented new recruits into the battalion.
- Responsible for soldiers' duty orders and equipments.
- Effectively processed duty assignments and finalizing retiree's health and pension plans.

741 Boston Post Road, Suite 101, Guilford, CT  06437
(203) 453-5535 • Fax (203) 453-5545 • www.bohan-bradstreet.com

Cannon-000004

# Bohan &
# Bradstreet, Inc.

Professional Search and Recruitment – Staff through Executive Level

Accounting/Financial • Information Technology • Engineering/Manufacturing • Human Resources • Sales/Marketing

*Damian J. Hendricks, page 3*

**United States Navy - Naval Weapons Station Earle**
**Engineman 3rd Class Petty Officer**

Earle, New Jersey
June 1998 - June 2000

- Lead, supervised and trained RASE Division I and UNREP teams.
- Maintained and operated UNREP and VERTREP equipment onboard assigned naval vessel.

**Military Command Achievements:**
Mediterranean/Arabian Deployment 99-2, INSURV, Operation Linked Seas and Baltic OPS, NATO. Medals, Armed Forces Expeditionary Medals, Meritorious Unit Commendations, Navy Unit Commendations and Battle "E" Ribbon

## EDUCATION & SKILLS
**Monroe College**                                                         Bronx, New York
Bachelor of Arts in Accounting, April 2004
GPA 3.87: President's List Honors

Proficient in Oracle General Ledger, Discoverer Query Tool, ACBS Sub Ledger, Documentum, Workflow, Essbase (Hyperion), Peachtree, QuickBooks, and Business Objects.

Experience in MS Excel and Excel Pivot Tables and V-Lookup. Also possess proficiency in MS Power Point, and MS Access.

SFAS 95 "Statement of Cash Flow" certification.
Six Sigma (Green Belt) certified.

Cannon-000005

# Bohan & Bradstreet, Inc.

Celebrating **20 Years** of Successful
Professional Search and Recruitment

Accounting/Financial• Information Technology • Engineering/Manufacturing • Human Resources • Sales/Marketing

## PROFESSIONAL REFERENCE FOR
## DAMIAN HENDRICKS

**Contacted:**     Greg Whitby, Assistant Controller, Prime Energy
Former Lead Analyst (Supervisor) at GE
(203) 358-5771

A glowing reference was received from Greg. Paraphrases of Mr. Whitby's comments are as follows:

"I have had the pleasure of knowing Damian since hiring him back in 2005. He was a Senior Financial Analyst that reported into me along with the Controller. His responsibilities involved managing the cash portion of the balance sheet and he was also involved in numerous special projects.

While Damian was at GE, the company was in process of shipping a lot of our responsibilities off to India. And even though he knew that his job may soon be compromised he still put in 110%. Of all of his numerous strengths, I would say his specialty is streamlining processes. He earned his Green Belt while at GE and some of his most important contributions were helping to reduce the time it took to close the books along with managing a recently acquired business that was completely out of balance. He handled the assignment well and completed all reconciliations prior to the business being transferred to India. The project was completed ahead of schedule, with no complications, and exceeded all my expectations.

Damian is a reliable and excellent team player. He knows how to get the job done, and manage everything thrown at him. His diligence and follow-through earned him all "outstanding" marks on his last performance review. He had a high level deliverables and met them all. A well liked individual within the organization, he maintained excellent relationships not just in our office but also with individuals in our offices in Colorado and India. He was constantly calling them, pulling together information from multiple sources and his success definitely reflected his excellent communication skills.

With his high energy and motivation to work, I think he would make a great manager. He knows how to keep a team focused and doesn't let anything slip between the cracks. Always attentive to detail, great at prioritizing and adapts well to change. He certainly ranks highest among his peers and I would definitely hire him again – in fact, I've tried!"

Prepared by
Jennifer C. Worcester
March 28, 2008

741 Boston Post Rd. Guilford, CT  06437
(203) 453-5535 Fax (203) 453-5545 www.bohan-bradstreet.com

Cannon-000006



# Bohan & Bradstreet, Inc.

Celebrating **20 Years** of Successful
Professional Search and Recruitment

Accounting/Financial• Information Technology • Engineering/Manufacturing • Human Resources • Sales/Marketing

## PROFESSIONAL REFERENCE FOR
## DAMIAN HENDRICKS

**Contacted:**        Miguel Zablah (peer)
Hedge Fund Analyst, JP Morgan
(954) 629-6081

Paraphrases of Mr. Zablah's comments are as follows:

"I met Damian here at JP Morgan. I am currently a Hedge Fund Analyst and Damian works in a group parallel to mine. We are both responsible for the financial reporting (monthly, quarterly, semi-annually and yearly) for a number of clients. We maintain client relationships and we work with auditors. Essentially, we are the final step in the "back office."

Damian joined us during busy season when there was not a lot of time for training, but he learned very quickly and hit the ground running. An effective and friendly worker, Damian adapted well to our environment and gets along well with everyone. He made friends very quickly. Damian is a smart worker; he has approximately a two hour commute and he is always here early and stays until about nine or ten at night. He never complains, gets the job done, and all the while, keeps his clients happy.

Not afraid to speak up when he notices a discrepancy, he communicates very well with his peers and with management. Dependable and diligent, he follows directions well, works hard, and performs very efficiently. He doesn't wait for the work to come to him, he goes and finds it. Currently, he is handling a very complex client and is succeeding in producing work of excellent quality. He will get it right the first time, double checking before it is handed in. Damian really wants to understand the process, will ask questions when he needs clarification, and is the best team-player I have ever seen. He certainly ranks high among his peer group. He has excellent accounting knowledge base and is very good at what he does. It will be a shame to lose him."

Prepared by
Jennifer C. Worcester
March 28, 2008

741 Boston Post Rd. Guilford, CT 06437
(203) 453-5535 Fax (203) 453-5545 www.bohan-bradstreet.com

Cannon-000007

April 10, 2008

Mr. Damian Hendricks
12 Manor Road
New Milford, CT   06776

Dear Damian,

We are pleased to welcome you to Cannondale Bicycle Corporation as an Accounting and Audit Supervisor, reporting to Tom Burke, Controller, with a start date of Wednesday, April 16, 2008. Your annual salary will be $82,500, paid weekly. Our business hours are 8:30am to 5:30pm.

Other details pertaining to your employment are listed on the attached copy of your offer letter.

Enclosed, please find an orientation package with benefit booklets, miscellaneous information and the following confidential forms. On your first day, park in the front of the building and ask for me upon your arrival at 8:45am. Please remember to bring two forms of identification for the Employment Verification Eligibility (i.e. social security card, driver license, etc.).

EMPLOYMENT DOCUMENTS

1.   **Employment Agreement** - As a condition of employment with Cannondale, you must execute the two (2) enclosed employee agreements before commencing work as a Cannondale Employee.   This Employment Agreement contains, among other things, a non-compete clause.

2.   **Application of Employment** – if one was not completed at time of interview, please complete and return.

3.   **Sexual Harassment Policy** - Please find two (2) copies of our Sexual Harassment Policy for your review and signature.

4.   **Substance Abuse/Drug Testing Agreement** - We are a drug-free environment; therefore, we request you agree to our policy.

5.   **Authorization to Release Information** - This form authorizes the release of medical information to Cannondale Bicycle Corporation or its legal representative to enable the company to determine benefits eligibility or modified-duty job placement in the event of a workers' compensation incident.

6.   **Exercise Equipment Release Form** - Allows you to use the exercise equipment, provided for your discretionary use.



CANNONDALE BICYCLE CORPORATION · 16 TROWBRIDGE DRIVE, BETHEL, CT 06801 ° 203.749.7000 ƒ 203.748.4012 E CUSTSERV@CANNONDALE.COM · WWW.CANNONDALE.COM

Cannon-000008

7.   **Employee Purchase Agreement** - Cannondale products are made available to you, as an employee, at a discounted price.    All employee orders are to be made using this request/agreement form and submitted to the appropriate person.

8.   **Network Usage Guidelines** - A policy guideline for use of the Internet.

9.   **Image Consent & Release Form** - Allows Cannondale to use your name, likeness and relevant business contact information in its printed materials, videotapes, websites and other media.


PAYROLL DOCUMENTS

10.   **New Employee Data Sheet** – complete, sign and return.

11.   **Employment Eligibility Verification (I-9)** - Complete section 1.  Please supply one item from List A *OR* one item from List B *AND* one item from List C.  A copy of these items will be retained for reference.  **We cannot initiate your pay until we receive from you the proper identification (as specified in the enclosed document).**

12.   **W-4 - Federal and State (if applicable) Withholding** - Please complete and return.

13.   **Direct Deposit Authorization** - If you wish to have all or a portion of your paycheck directly deposited into your bank account, complete and attach a canceled check or deposit slip to the authorization form.

LIFE/HEALTH INSURANCE DOCUMENTS – you have 30 days from your hire date to enroll in Cannondale's health insurance and benefit plans.

14.   **Life Insurance Enrollment Form.** You are provided with a company paid term life insurance policy worth one times your annual base salary with a maximum $350,000.00; however, you must complete the Beneficiary Form.

15.   **Optional Life Insurance for Employee and Dependents** – you may purchase additional life insurance for you and your dependents.  Premiums are paid through payroll deductions. Please review the attached packet and Prudential Enrollment Form.

16.   **Continuation Notice** – This notice informs you and your family of your continuation rights under the group health insurance plan in certain instances where coverage under the plan would otherwise end.

17.   **Medical Insurance** - If you wish to enroll in our Medical/RX Plan, complete the enclosed Anthem Blue Cross/Blue Shield Enrollment Form.

18.   **Dental Insurance** - If you wish to enroll in our Dental Plan, complete the enclosed Delta Dental Plan Enrollment Form.

19.   **Vision Insurance** - If you wish to enroll in our Vision Plan, complete the enclosed Vision Benefits of America Enrollment Form.

20.   **Health Insurance Deduction Election** - If you wish to enroll in either of the medical, dental or vision plans, please complete this form indicating level of coverage.

21.   **Tax Advantage Plan/Section 125** - If you are enrolling in our medical/dental/vision plans, you may elect to have your health insurance deductions taken out before or after taxes. Please complete the form and return.

22.   **Certificate of Health Coverage** - If you had prior coverage, please submit a copy with your health insurance enrollment form(s).

OTHER BENEFITS or POLICIES

23.   **Travel/Other Expense Policy.** A guideline highlighting the policies and procedures necessary to comply with our Travel and Expense Program.

24.   **Flexible Spending Account.** This allows you to put pre-tax deductions from your weekly pay, into a flexible spending account for health care and/or dependent care expenses. You have 30 days from your date of eligibility to enroll.

25.   **401(k) Profit Sharing Plan** – Employees will be automatically enrolled in the Plan with a salary deferral of 3% after meeting the following eligibility:  must be 18 years of age or older, and have completed 90 days of employment.  Employees may rollover contributions from a prior qualified plan immediately after hire.  An enrollment package will be forwarded to you from MassMutual Retirement Services.  The Auto Enrollment and Qualified Default Investment Account Notice is enclosed.

26.   **Met Life Program** – you are eligible to purchase automobile, homeowners or renters insurance through Met Life. Premiums may be made through payroll deductions.

27.   **Credit Union** – Cannondale employees may join the Mutual Security Credit Union in Connecticut. Please contact Human Resources for a membership packet.

Congratulations, we're a great company!  We look forward to having you join Cannondale Bicycle Corporation.

Sincerely,

Kathryn M. Stevens
Human Resource Generalist

March 28, 2008

Mr. Damian Hendricks
12 Manor Road
New Milford, CT 06776

Dear Damian,

On behalf of Cannondale Bicycle Corporation, I am pleased to offer you the position of Accounting and Audit Supervisor, reporting to Tom Burke, Controller. Your annual base salary will be $82,500, paid weekly, with a tentative start date of Monday, April 14, 2008.

After six months, you will be entitled to two (2) weeks of vacation in your first year, accrued on a weekly basis throughout the year.

You will be eligible to participate in Cannondale's benefit plans upon your date of hire. These benefits include but are not limited to medical, dental, vision, flexible spending, life insurance, short and long term disability. A Summary of Benefits is attached for your review.

If you are in agreement with this offer from Cannondale, please sign below and return to my attention via email or our confidential HR fax number 203-748-4174 by Monday, March 31, 2008.

Please feel free to call me at (203) 749-7113 with any questions. We are a great company and certainly hope that you agree to join the Cannondale family.

Sincerely,

*Kathryn M. Stevens*

Kathryn M. Stevens
Human Resource Generalist

_Damian John Hendricks_               _March 31, ?8_
Signature                                        Date

CANNONDALE BICYCLE CORPORATION • 16 TROWBRIDGE DRIVE, BETHEL, CT 06801  P:203.749.7000  F:203.748.4012  E:CUSTSERV@CANNONDALE.COM • WWW.CANNONDALE.COM

## Cannondale Bicycle Corporation

16 Trowbridge Drive
Bethel, CT   06801
(203) 749-7000
Fax (203) 748-4174

172 Friendship Village Road
Bedford, PA  15522
(814) 623-9073
Fax (814) 623-6604

# APPLICATION FOR EMPLOYMENT

Applicants are considered based on qualifications for all positions without regard to race, color, religion, gender, national origin, age, marital or veteran status, or disability, or any other legally protected status.

Date of Application  _3-13-08_

Position(s) Applied For _ACCOUNTING MANAGER_

Name _DAMIAN   HENDRICKS_

Address  REDACTED

City  REDACTED                State  REDACTED    Zip Code  REDACTED

Telephone  REDACTED          Cell Phone  REDACTED

Email Address  _dhendricks78 @ aol. com_

If under the age of 18, can you furnish a work permit?        Y _✓_   N ___

Are you legally eligible for employment in the United States?   Y _✓_   N ___
(Proof of citizenship or immigration status will be required upon employment).

On what date would you be available for work? _NEGOTIABLE_

Are you available to work  Full Time _✓_     Part Time ___      Temporary ___

Have you been convicted of a felony within the last 7 years?     Y ___   N _✓_

If yes, please explain _____

Are you able to perform the essential functions of the job?  Y _✓_  N ___   if no, are there any reasonable workplace accommodations that can be made to allow you to perform the essential functions of the job?   Y ___   N ___

If yes, please indicate _____

**cannondale**
FEEL IT.

# EMPLOYMENT EXPERIENCE

Start with your present or most recent position. Include military service assignments. May we contact your present employer? Y ✓ N ___

---

**Employer** JPMORGAN HEDGE FUND SERVICES
**Address** TWO AMERICAN LANE GREENWICH CT 06831
**Job Title** FINANCIAL REPORTING ANALYST
**Supervisor** JENNIFER BLACKWELL
**Reason for Leaving** AN OPPORTUNITY TO UTILIZE MY ACCOUNTING SKILLS

**Dates Employed**
From / To
3/07 / PRESENT

**Hourly Rate/Salary**
Starting Final
80,000 / 80,000

**Work Performed** PREPARE FINANCIAL STATEMENTS FOR VARIOUS HEDGE FUND CLIENTS

---

**Employer** GENERAL ELECTRIC
**Address** 701 MERRITT SEVEN NORWALK CT
**Job Title** SENIOR ANALYST
**Supervisor** DIMPLE MAKHIJANI
**Reason for Leaving** RE-ORGANIZATION

**Dates Employed**
From / To
2/05 / 3/07

**Hourly Rate/Salary**
Starting Final

**Work Performed** SOX TESTING AND VARIOUS ACCOUNTING ACTIVITIES

---

**Employer** PEPSI BOTTLING GROUP
**Address** One PEPSI WAY SOMERS, NY
**Job Title** ACCOUNTANT
**Supervisor** LISA DOTLAR
**Reason for Leaving** CAREER ADVANCEMENT

**Dates Employed**
From / To
6/04 / 2/05

**Hourly Rate/Salary**
Starting Final

**Work Performed** PROCESSED FIXED ASSETS ACTIVITIES

---

Please explain any gaps in employment:

---

If you need additional space, please continue on a separate sheet of paper.

Cannon-000013

**Special Skills and Qualifications**
Summarize special skills and qualifications acquired from employment or other experience.

SIX SIGMA CERTIFIED

List professional, trade, business or civic activities and offices held (please exclude memberships which may reveal gender, race, religion, national origin, age, disability or other protected status).

Give name, address, telephone number, and position of three business references.

GREG WHITBY - SUPERVISOR - 203-219-9467

CHARLES ROBINSON - FUND ACCOUNTANT - 914-682-7190

DIMPLE NMAENIJANI - ASSISTANT CONTROLLER -

## EDUCATION

|  | High School | College/University | Graduate/Professional |
|---|---|---|---|
| School Name | Kingston College HS | Monroe COLLEGE | |
| Years Completed | 9  10  (11)  12 | 1  2  3  (4) | 1  2  3  4 |
| Diploma/Degree | HS DIPLOMA | Bachelor's DEGREE | |
| Describe Course of Study | LIBERAL ARTS | ACCOUNTING | |
| Describe Specialized Training, Apprentice-ship, Skills, and Extra-Curricular Activities | | | |

Honors Received:

PRESIDENT'S LIST HONORS

State any additional information you feel may be helpful to us in considering your application.

On a voluntary basis, please indicate the following:

Gender:  ✓ Male  ___ Female

Race:  ___ Hispanic or Latino

___ White (Not Hispanic or Latino)

✓ Black or African American (Not Hispanic or Latino)

___ Native Hawaiian or Other Pacific Islander (Not Hispanic or Latino)

___ Asian (Not Hispanic or Latino)

___ American Indian or Alaska Native (Not Hispanic or Latino)

___ Two or More Races (Not Hispanic or Latino)

## Agreement

I certify that answers given herein are true and complete to the best of my knowledge.

I authorize verification of all statements contained in this application for employment as may be necessary in arriving at an employment decision. I understand that this application is not and is not intended to be a contract of employment.

I understand that if offered a position with Cannondale Bicycle Corporation, I may be required to submit to a pre-employment drug screen as a condition of employment.

I understand that false or misleading information given in my application or interview(s) may result in denial of employment or discharge. I understand, also, that I am required to abide by all rules and regulations of the Company.

Damian John Hendricks                        4-11-08
**Signature of Applicant**                                **Date**

Rev 01/2008 HRD

Cannon-000015

# EXHIBIT EE

**From:**      Damian Hendricks
**Sent:**       Monday, September 10, 2007 5:02:20 PM
**To:**          'Carvajal, Hervey'
**Subject:**   RE:

You what, kid? They have a funny structure over here. We all are called fund accountant specialist but our functions are different. In my group, we don't book entries and we don't have monthly closes. All we do is provide services to the hedge fund clients as far as investor reports and preparing financial statement with footnotes. We do the bal sheet, cash flow and income statement from scratch.

But like I said a good price to come in would be at 60K so if you decide to come in tell them you are at around 55K. They would not expect anyone to be making less than 55 in this day and age. I think that would be a good fit.

The good thing is, they don't work with outside recruiters anymore because they want us, the existing employees to bring people in. They figure if they make our lives easy here, we can bring other people in and grow the company, because the need people a lot.

Get your resume ready and lets go do it big, like we know how.

**From:** Carvajal, Hervey [mailto:Carvajal@usta.com]
**Sent:** Monday, September 10, 2007 4:54 PM
**To:** Damian Hendricks
**Subject:** RE:

Fund Account Specialist: is this your title??

What's the pay rang for those in the department?

Hervey Carvajal
USTA Staff Accountant
Player Development & Admin



HEND0017326

**Fund Accountant Specialist – 070033948**

Job Description

Apply Online

Apply Online

Description

JPMorgan Chase is a leading global financial services firm with assets of $1.1 trillion and operations in more than 50 countries. The firm is a leader in investment banking, financial services for consumers and businesses, financial transaction processing, asset and wealth management, and private equity. Under the JPMorgan, Chase and Bank One brands, the firm serves millions of consumers in the United States and many of the world's most prominent corporate, institutional and government clients.

If you're interested in working in an environment where leadership, excellence, integrity and diversity are among our core principles, then explore the opportunities at JPMorgan Chase. Further information about careers at JPMorgan Chase can be found on our website:www.jpmorganchase.com.

Primarily responsible for the preparation of our clients (hedge funds) financial statements as well as various management reporting schedules (eg. performance , support schedles for financial statement footnotes, return and capital

schedules, expense analysis).

HEND0017327

- Work closely with othe depts such as IT and portfolio accounting

- Ability to work independently and as a key member of a group

Qualifications

-Strong technical knowledge of accounting and financial reporting

- Strong analytical skills

- Public accounting background is a plus

- Hedge fund/financial service industry accounting experience is a plus

- Strong Microsoft Excel & Word skills

- B.S. or above in Accounting preferred

Job category

Accounting

Locations

US-CT-Greenwich-One American Lane / 53306

HEND0017328

Organization

Alternative Investment Service

Schedule

Full-time

Job Type

Standard

Shift

Day Job

Employee Status

Regular

HEND0017329

Referral bonus

2,500.00 USD

Recruiter

Szczepanski, Mary L

Hiring manager

Iuliano, Patrick

Refer a friend for this job

Return to the job list

**Notice the 2500 referral bonus**

HEND0017330

**From:** Carvajal, Hervey [mailto:Carvajal@usta.com]
**Sent:** Monday, September 10, 2007 4:27 PM
**To:** Damian Hendricks
**Subject:** RE:


NO MAN.  I HAVENT HEARD FORM THAT DUDE SINCE I HAD A HAIRLINE


Hervey Carvajal
USTA Staff Accountant
Player Development & Admin
70 West Red Oak Lane
White Plains, NY 10604
Email: Carvajal@USTA.com
Phone: 914-697-2384


**From:** Damian Hendricks [mailto:damian.hendricks@hedgefundservices.com]
**Sent:** Monday, September 10, 2007 4:24 PM
**To:** Carvajal, Hervey
**Subject:**


Did Dunstan ask you to join him in his business?


## Damian Hendricks

**JP Morgan Hedge Fund Services**

One American Lane, 1st Floor

Greenwich, CT 06831-45430

Tel. (203) 302-6029

**damian.hendricks@hedgefundservices.com**

**damian.hendricks@jpmorganchase.com**

HEND0017331

This transmission may contain information that is privileged,
confidential,
legally privileged, and/or exempt from disclosure under applicable law.
If you
are not the intended recipient, you are hereby notified that any
disclosure,
copying, distribution, or use of the information contained herein
(including
any reliance thereon) is STRICTLY PROHIBITED. Although this
transmission and
any attachments are believed to be free of any virus or other defect
that might
affect any computer system into which it is received and opened, it is
the
responsibility of the recipient to ensure that it is virus free and no
responsibility is accepted by JPMorgan Chase & Co., its subsidiaries,
and
affiliates, as applicable, for any loss or damage arising in any way
from its
use. If you received this transmission in error, please immediately
contact the
sender and destroy the material in its entirety, whether in electronic
or hard
copy format. Thank you.

This transmission may contain information that is privileged,
confidential,
legally privileged, and/or exempt from disclosure under applicable law.
If you
are not the intended recipient, you are hereby notified that any
disclosure,
copying, distribution, or use of the information contained herein
(including
any reliance thereon) is STRICTLY PROHIBITED. Although this
transmission and
any attachments are believed to be free of any virus or other defect
that might
affect any computer system into which it is received and opened, it is
the
responsibility of the recipient to ensure that it is virus free and no
responsibility is accepted by JPMorgan Chase & Co., its subsidiaries,
and
affiliates, as applicable, for any loss or damage arising in any way
from its
use. If you received this transmission in error, please immediately
contact the
sender and destroy the material in its entirety, whether in electronic
or hard
copy format. Thank you.

HEND0017332

# EXHIBIT FF

Back to prior page

**Fund Accounting Specialist - Financial and Regulatory Reporting - Dublin, Ireland-080009061**
**Description**
**JOB TITLE:**       **Fund Accountant, Reporting**
**LOCATION:**        **Dublin**
**DEPARTMENT:**      **Fund Accounting**
**REPORTING TO:**    **Assistant Treasurer - Financial & Regulatory Reporting**

**About JP Morgan WSS**

JPMorgan Worldwide Securities Services, a division of JPMorgan Chase Bank, N.A., is a global industry leader with $15.2 trillion in assets under custody. JPMorgan provides innovative custody, fund accounting and administration and securities services to the world's largest institutional investors, alternative asset managers and debt and equity issuers. JPMorgan Worldwide Securities Services leverages its scale and capabilities in more than 90 markets to help clients optimize efficiency, mitigate risk and enhance revenue through a broad range of investor services as well as securities clearance, collateral management and alternative investment services.

The Financial and Regulatory Reporting Group produces annual and semi-annual reports for the funds that JPMorgan administers. This role involves participation in the production and review of both statutory and regulatory reports.

**Main Duties and Responsibilities**

q    Preparation and review of fund and management company financial statements in accordance with accounting and regulatory requirements within   agreed deadlines.
q    Review of files and packages prepared to assist audit of financial statements.
q    Liaise with the necessary internal and external parties in order to prepare, approve and issue reports (including auditors, clients, and directors).
q    Preparation and issue of regulatory and other reports as required.
q    Partake in special projects as required.
q  . Recognise and act on opportunities to improve processes including developing and making recommendations for change.

**Qualifications**

**Key Skills and Knowledge**

q    In-depth knowledge of financial and regulatory reporting requirements
q    Knowledge of financial instruments and their accounting treatment
q    In-depth knowledge of fund administration, in particular the valuation function and its fit into the overall fund administration area
q    Superior knowledge of software packages (Word, Excel, Access, etc)
q    Operational knowledge of fund accounting systems (e.g. Invest One, HiPortfolio)
q    Excellent communication skills – both written and verbal
q    Time management and organisational skills
q    Good attention to detail, with strong analytical and numerical skills
q    Ability to work on own initiative with minimum supervision
q    Self motivated and innovative
q    Interpersonal sensitivity

**Experience and Qualifications**

The incumbent will have an in-depth working knowledge of a Fund Accounting environment with experience in financial statement preparation. The incumbent should preferably have a relevant accounting qualification.

JPMorgan offers an exceptional benefits program and a highly competitive compensation package.

JPMorgan is an Equal Opportunity Employer.

DEFENDANT'S
EXHIBIT
29
3/24/09

https://jpmchase.taleo.net/careersection/1/jobdetail.ftl                                  4/1/2008

**PLEASE NOTE: ALL INTERNAL MOVES WILL NORMALLY TAKE PLACE ON THE SAME GRADE AND
SAME SALARY. SALARIES ARE REVIEWED ANUALLY IN FEBRUARY. EXCEPTIONS TO THE RULE
REGARDING TRANSFER ON CURRENT SALARY MAY INCLUDE A MOVE BETWEEN GEOGRAPHIC
LOCATIONS.**

**Job** Accounting
**Primary Location** IE-L*-D-JPMorgan House / 01146
**Organization** WSS Operations
**Schedule** Full-time
**Job Type** Standard
**Shift** Day Job
**Employee Status** Regular
Employee Referral Bonus **2,000.00**

https://jpmchase.taleo.net/careersection/1/jobdetail.ftl                    4/1/2008

# EXHIBIT GG

# EMPLOYEE RIGHTS
## UNDER THE FAIR LABOR STANDARDS ACT
THE UNITED STATES DEPARTMENT OF LABOR WAGE AND HOUR DIVISION

## FEDERAL MINIMUM WAGE

**$5.85** PER HOUR
BEGINNING JULY 24, 2007

**$6.55** PER HOUR
BEGINNING JULY 24, 2008

**$7.25** PER HOUR
BEGINNING JULY 24, 2009

**OVERTIME PAY**
At least 1 1/2 times your regular rate of pay for all hours worked over 40 in a workweek.

**YOUTH EMPLOYMENT**
An employee must be at least 16 years old to work in most non-farm jobs and at least 18 to work in non-farm jobs declared hazardous by the Secretary of Labor.

Youths 14 and 15 years old may work outside school hours in various non-manufacturing, non-mining, non-hazardous jobs under the following conditions:

*No more than*
- 3 hours on a school day or 18 hours in a school week;
- 8 hours on a non-school day or 40 hours in a non-school week.

Also, work may not begin before 7 a.m. or end after 7 p.m., except from June 1 through Labor Day, when evening hours are extended to 9 p.m. Different rules apply in agricultural employment. For more information, visit the YouthRules! Web site at **www.youthrules.dol.gov**.

**TIP CREDIT**
Employers of "tipped employees" must pay a cash wage of at least $2.13 per hour if they claim a tip credit against their minimum wage obligation. If an employee's tips combined with the employer's cash wage of at least $2.13 per hour do not equal the minimum hourly wage, the employer must make up the difference. Certain other conditions must also be met.

**ENFORCEMENT**
The Department of Labor may recover back wages either administratively or through court action, for the employees that have been underpaid in violation of the law. Violations may result in civil or criminal action.

Civil money penalties of up to $11,000 per violation may be assessed against employers who violate the youth employment provisions of the law and up to $1,100 per violation against employers who willfully or repeatedly violate the minimum wage or overtime pay provisions. This law prohibits discriminating against or discharging workers who file a complaint or participate in any proceedings under the Act.

**ADDITIONAL INFORMATION**
- Certain occupations and establishments are exempt from the minimum wage and/or overtime pay provisions.
- Special provisions apply to workers in American Samoa and the Commonwealth of the Northern Mariana Islands.
- Some state laws provide greater employee protections; employers must comply with both.
- The law requires employers to display this poster where employees can readily see it.
- Employees under 20 years of age may be paid $4.25 per hour during their first 90 consecutive calendar days of employment with an employer.
- Certain full-time students, student learners, apprentices, and workers with disabilities may be paid less than the minimum wage under special certificates issued by the Department of Labor.

For additional information:
## 1-866-4-USWAGE
(1-866-487-9243)    TTY: 1-877-889-5627

## WWW.WAGEHOUR.DOL.GOV

U.S. Department of Labor | Employment Standards Administration | Wage and Hour Division
WHD Publication 1088 (Revised June 2007)

# NOTI
## EMPLOYEE PC
## PROTECTIC

The Employee Polygraph Protection Act prohibit lie detector tests either for pre-employment scree employment.

## PROHIBITIONS

Employers are generally prohibited from requir job applicant to take a lie detector test, and fro discriminating against an employee or prospec test or for exercising other rights under the Act

## EXEMPTIONS*

Federal, State and local governments are not a does not apply to tests given by the Federal G individuals engaged in national security-related

The Act permits *polygraph* (a kind of lie detect private sector, subject to restrictions, to certain service firms (armored car, alarm, and guard), manufacturers, distributors and dispensers.

The Act also permits polygraph testing, subjec employees of private firms who are reasonably workplace incident (theft, embezzlement, etc.) employer.

## EXAMINEE RIGHTS

Where polygraph tests are permitted, they are standards concerning the conduct and length number of specific rights, including the right to right to refuse or discontinue a test, and the ri to unauthorized persons.

## ENFORCEMENT

The Secretary of Labor may bring court action civil penalties up to $10,000 against violators. also bring their own court actions.

## ADDITIONAL INFORMAT

Additional Information may be obtained from, filed with, the local offices of the Wage and Hi Wage-Hour office, telephone our toll-free infc 1-866-4US-WAGE (1-866-487-9243) or TTY: representative is available to assist you w to 5pm in your time zone. If you have acce onto our Home Page at *www.wagehour.do*

**THE LAW REQUIRES EMPLOYERS TO D
EMPLOYEES AND JOB APPLICANTS C**

*The law does not preempt any provision of a bargaining agreement which is more restricti*

U.S. DEPARTMENT OF LABOR
EMPLOYMENT STANDARDS ADMINISTRA
Wage and Hour Division
Washington, D.C. 20210

*Public Law 100-347 Sec. 4.*

DEFENDANT'S
EXHIBIT
30
3/24/09

HEND0017497

# ECTICUT

These Administrative Regulations must be posted and maintained wherever workers covered by this Act are employed.

## CONNECTICUT DEPARTMENT OF LABOR
## WAGE AND WORKPLACE STANDARDS DIVISION

MINORS UNDER 18 YEARS OF AGE EMPLOYED BY THE STATE OR POLITICAL SUBDIVISION THEREOF MAY BE PAID 85% OF THE APPLICABLE MINIMUM WAGE.

MINORS UNDER 18 YEARS OF AGE EMPLOYED IN AGRICULTURE MAY BE PAID 85% OF THE APPLICABLE MINIMUM WAGE. MINORS EMPLOYED BY AGRICULTURAL EMPLOYERS WHO DID NOT, DURING THE PRECEDING CALENDAR YEAR, EMPLOY EIGHT OR MORE WORKERS AT THE SAME TIME SHALL BE PAID A MINIMUM WAGE OF NOT LESS THAN 70% OF THE MINIMUM WAGE AS DEFINED IN SECTION 31-58. MINORS IN OTHER EMPLOYMENT – SEE SECTION 31-60-6.

### MINIMUM WAGE:  $7.40 An Hour Beginning January 1, 2006
### $7.65 An Hour Beginning January 1, 2007

OVERTIME – ONE AND ONE-HALF TIMES THE EMPLOYEE'S REGULAR RATE OF PAY AFTER 40 HOURS PER WEEK. FOR EXCEPTIONS – SEE SECTION 31-76I OF THE CONNECTICUT STATUTES.

**Section 31-60-1. Piece rates in relation to time rates or incentive pay plans, including commissions and bonuses.**

(a) Definitions. For the purposes of this regulation, "piece rates" means an established rate per unit of work performed without regard to time required for such accomplishment. "Commissions" means any premium or incentive compensation for business transacted which is based on per centum of total valuation or specific rate per unit of accomplishment. "Incentive plan" means any method of compensation, including without limitation herein, commissions, piece rate, bonuses, etc., based upon the amount of results produced, where the payment is in accordance with a fixed plan by which the employee becomes entitled to the compensation upon fulfillment of the conditions established as part of the working agreement, but shall be subject to the limitation hereinafter set forth.

(b) Record of wages. Each employer shall maintain records of wages paid to each employee who is compensated for his services in accordance with an incentive plan in such form as to enable such compensation to be translated readily into terms of average hourly rate on a weekly basis for each work week or part thereof of employment.

(c) Piece rates in relation to time rates:
(1) When an employee is compensated solely at piece rates he shall be paid a sufficient amount at piece rates (a week) an average rate of at least the minimum wage for each hour worked in any week, and the wage paid to such employee shall be not less than the minimum wage for each hour worked.

(2) When an employee is compensated at piece rates for certain hours of work in a week and at an hourly rate for other hours, the employee's hourly rate shall be at least the minimum wage and his earnings from piece rates shall average at least the minimum wage for each hour worked on piece rate for that work week, and the wage paid to such employee shall not be less than the minimum wage for each hour worked.

(3) When an employee is employed at a combination of hourly rate and piece rate for the same hours of work (i.e., an incentive pay plan superimposed upon an hourly rate or a piece rate coupled with a minimum hourly guarantee), the employee shall receive an average rate of at least the minimum wage an hour for each hour worked in any week and the wage paid to such employee shall be not less than the minimum wage for each hour worked.

(d) Commission.
(1) When an employee is compensated solely on a commission basis, he shall be paid weekly an average of at least the minimum wage per hour for each hour worked.
(2) When an employee is paid in accordance with a plan providing for a base rate plus commission, the wage paid weekly to the employee from these combined sources shall equal at least an average or the minimum wage an hour for each hour worked in any work week. All commissions shall be settled at least once in each month in full. When earnings are derived in whole or in part on the basis of an incentive plan other than those defined herein, the employee shall receive weekly at least the minimum wage per hour for each hour worked in the work week, and the balance earned shall be settled at least once monthly.

**Section 31-60-2. Gratuities as part of the minimum fair wage.**

For the purposes of this regulation, "gratuity" means a voluntary monetary contribution received by the employee from a guest, patron or customer for service rendered.

(a) Unless otherwise prohibited by statutory provision or by a wage order, gratuities may be recognized as constituting a part of the minimum fair wage when all of the following provisions are complied with:

(1) The employee shall be engaged in an employment in which gratuities have customarily and usually constituted and have been recognized as part of his remuneration for hiring purposes; and

(2) The amount received in gratuities claimed as credit for part of the minimum fair wage shall be recorded on a weekly basis as a separate item in the wage record, even though payment is made more frequently; and

(3) Each employer claiming credit for gratuities as part of the minimum fair wage paid to any employee shall provide substantial evidence that the amount claimed, which shall not exceed the allowance hereinafter provided, was received by the employee. For example, a statement signed by the employee attesting that wages received, including gratuities not to exceed the minimum specified herein, together with other authorized allowances, represents a payment of not less than the minimum wage per hour for each hour worked during the pay period, will be accepted by the commissioner as "substantial evidence" for purposes of this section, provided all other requirements of this and other applicable regulations shall be complied with.

(4) Allowances for gratuities as part of the minimum fair wage shall not exceed 29.3% of the minimum wage for employees employed in the hotel and restaurant industry, who customarily receive gratuities...

designated by the employer shall be considered to be working time and shall be paid for as such, whether or not the employee is actually called upon to work.

(k) When an employee is subject to call for emergency service but is not required to be at a location designated by the employer but is simply required to keep the employer informed as to the location at which he may be contacted, or when an employee is not specifically required by his employer to be subject to call but is contacted by his employer or on the employer's authorization directly or indirectly and assigned to duty, working time shall begin when the employee is notified of his assignment and shall end when the employee has completed his assignment.

**Section 31-60-12. Records.**

(a) For the purpose of this regulation, "true and accurate records" means accurate legible records for each employee showing:

(1) His name;
(2) His home address;
(3) The occupation in which he is employed;
(4) The total daily and total weekly hours worked, showing the beginning and ending time of each work period, computed to the nearest unit of 15 minutes;
(5) His total hourly, daily or weekly basic wage;
(6) His overtime wage as a separate item from his basic wage;
(7) additions to or deductions from his wages each pay period;
(8) his total wages paid each pay period;
(9) such other records as are stipulated in accordance with sections 31-60-1 through 31-60-16;
(10) working certificates for minor employees (sixteen to eighteen years). True and accurate records shall be maintained and retained at the place of employment for a period of 3 years for each employees.

(b) The labor commissioner may authorize the maintenance of wage records and the retention of both wages and hour records as outlined either in whole or in part at a place other than the place of employment when it is demonstrated that the retention of such records at the place of employment either

(1) works an undue hardship on the employer without materially benefiting the inspection procedures of the labor department, or
(2) is not practical for enforcement purposes. Where permission is granted to maintain wage records at other than the place of employment, a record of total daily and weekly hours worked by each employee shall also be available for inspection in connection with such wage records.

(c) In the case of an employer who expends 75% or more of his working time away from his employer's place of business and the maintaining of time records showing the beginning and ending time of each work period for such employee either imposes an undue hardship upon the employer or exposes him to jeopardy because of his inability to control the accuracy of such entries, a record of total daily and total weekly hours will be accepted as fulfilling the record keeping requirements of this section. However, in such cases, the original time entries shall be made by the employer or on his behalf and the time entries made by the employee shall be used on the basis for payroll records.

(d) The employer shall maintain and retain for a period of 3 years the following information and data on each individual employed in a bona fide executive, administrative or professional capacity.

(1) his name;
(2) his home address;
(3) the occupation in which he is employed;
(4) the total wages paid each work period;
(5) the date of payment and the pay period covered by payment.

**Section 31-60-14. Employee in a bona fide Executive capacity.**

(a) For the purpose of section 31-58 (f) of the general statutes, as amended, "employee employed in a bona fide executive capacity" means one whose (1) whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof; and (2) who customarily and regularly directs the work of two or more other employees therein; and (3) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and (4) who customarily and regularly exercises discretionary powers; and (5) who does not devote more than 20 percent, or, in the case of an employee of a retail or service establishment who does not devote as much as forty percent, of his hours of work in the workweek to activities which are not directly and closely related to...

ccommodation,
ncome,
rental
religious creed
a guide dog
ublic and

marital status,
ty, race,

73/579-6950
13/505-6559
30-566-1997
30/886-2550
30/246-5419

e text.

Revised 1/02

:ES ACT

: OR ANY

: AN

'LOYMENT

:S WORK

:SES

:EMENT

ENALTIES.

GHTS AND
11-3459), and
180 days of the

'surance
sent office.

in employee.

HEND0017498

piece rate for that work week, and the wage paid to such employee shall not be less than the minimum wage for each hour worked.

(3) When an employee is employed at a combination of hourly rate and piece rate for the same hours of work (i.e., an incentive pay plan superimposed upon an hourly rate or a piece rate coupled with a minimum hourly guarantee), the employee shall receive an average rate of at least the minimum wage an hour for each hour worked in any week and the wage paid to such employee shall be not less than the minimum wage for each hour worked.

(c) Commission.

(1) When an employee is compensated solely on a commission basis, he shall be paid weekly an average of at least the minimum wage per hour for each hour worked.

(2) When an employee is paid in accordance with a plan providing for a base rate plus commission, the wage paid weekly to the employee from these combined sources shall equal at least an average of the minimum wage an hour for each hour worked in any work week. All commissions shall be settled at least once in each month in full. When earnings are delayed in whole or in part on the basis of an incentive plan other than those defined herein, the employee shall receive weekly at least the minimum wage per hour for each hour worked in the week, and the balance earned shall be settled at least once monthly.

### Section 31-60-2. Gratuities as part of the minimum fair wage.

For the purposes of this regulation, "gratuity" means a voluntary monetary contribution received by the employee from a guest, patron or customer for service rendered.

(a) Unless otherwise prohibited by statutory provision or by a wage order, gratuities may be recognized as constituting a part of the minimum fair wage when all of the following provisions are complied with:

(1) The employee shall be engaged in an employment in which gratuities have customarily and usually constituted and have been recognized as part of his remuneration for hiring purposes and

(2) The amount received in gratuities claimed as credit for part of the minimum fair wage shall be recorded on a weekly basis as a separate item in the wage record, even though payment is made more frequently and

(3) Each employer claiming credit for gratuities as part of the minimum fair wage paid to any employee shall provide substantial evidence that the amount claimed, which shall not exceed the allowance hereinafter provided, was received by the employee. For example, a statement signed by the employee attesting that wages received, including gratuities not to exceed the amount specified herein, together with other authorized allowances, represents a payment of not less than the minimum wage per hour for each hour worked during the pay period, will be accepted by the commissioner as "substantial evidence" for purposes of this section, provided all other requirements of this and other applicable regulations shall be complied with.

(b) Allowances for gratuities as part of the minimum fair wage shall not exceed 29.3% of the minimum wage for employees employed in the hotel and restaurant industry, who customarily receive gratuities, and 8.2% of the minimum fair wage for bartenders who customarily and regularly receive gratuities of not more than 35 cents per hour for employees in any other industry in which it can be established that gratuities have, prior to July 1, 1967, customarily and usually constituted and been recognized as part of the employee's remuneration for hiring purposes for the particular employment. Gratuities received in excess of the amount specified herein as allowance need not be reported or recorded for the purposes of this regulation. The wage paid to each employee shall be at least the minimum wage per hour for each hour worked, which may include gratuities not to exceed the limitation herein set forth, provided all conditions herein set forth shall be met. *(See P.A. 04-58 for precise language.)*

### Section 31-60-3. Deductions and allowances for reasonable value of board and lodging.

(a) For purposes of this regulation, "board" means food furnished in the form of meals on a regularly established schedule. "Lodging" means housing facility available to him at all hours of the day wherein the employee sleeps, rests and may store clothing and personal belongings.

(b) Wages paid to any employee may include the reasonable value of board and/or lodging as herein established and may be considered as part of the minimum fair wage if such a condition is made known to and accepted by the employee at the time of hiring or change of classification as a usual condition of employment, in accordance with the foregoing. An allowance or deduction of not more than eighty-five cents for a full meal and forty-five cents for a light meal will be permitted as part payment of the minimum fair wage, provided such allowance or deduction shall be made in accordance with the hiring agreement which provides for such an allowance or deduction.

(c) A full meal shall provide to the employee a variety of wholesome nutritious food and shall include adequate portions of at least one of the types of food from four of the following groups:

(1) Fruit juice or soup;
(2) fruit or vegetables;
(3) bread, cereal or potatoes;
(4) eggs, meat, fish (or a recognized substitute);
(5) beverage;
(6) dessert.

(d) For a meal which does not meet the qualifications of a full meal, as herein defined, but does provide to the employee adequate portions of wholesome nutritious food, and does include one of the types of food from at least three of the following groups, an allowance not to exceed forty-five cents will be permitted as part payment of the minimum fair wage:

(1) Fruit, fruit juice, soup;
(2) cereal, bread (or a recognized substitute);
(3) eggs, meat, fish including sandwiches made thereof (or a recognized substitute);
(4) dessert;
(5) beverage.

(e) No allowances or deductions in excess of $2.55 a day for full meals as supplied, or in excess of ninety cents for light meals, as supplied, will be permitted as part payment of the minimum fair wage. In any case where full meals are made available to the employee by the employer, the allowance of eighty-five cents for a full meal as defined will be permitted as part payment of the minimum fair wage. In such a case the employee may not elect the light meal in lieu of the full meal. Allowances or deductions may be made only for meals consistent with the employee's work shift when the employee is on duty, and only for meals consistent with a regular meal schedule when the employee is off duty.

(f) An allowance or deduction of not more than $4.00 a week for a private room, or of not more than $3.00 a week for a room shared with others, will be permitted as part payment of the minimum fair wage, provided the allowance or deduction shall be made in accordance with a hiring agreement which provides for such an allowance or deduction. An allowance or deduction for lodging will be permitted as part payment of the minimum fair wage only when the facility supplied conforms to reasonable specifications with respect to size, privacy, sanitation, heat, light and ventilation. All such facilities shall be open to inspection by an authorized representative of the labor commissioner at any reasonable time. When housing consisting of more than one room is provided for the employee and such circumstances are established in the hiring agreement, the labor commissioner shall establish a reasonable allowance for such housing and in establishing such allowance as it should apply in terms of part 1 of chapter 558 of the general statutes shall be guided by the prevailing rentals for similar quarters including those authorized by the local housing authority in privately or publicly financed housing. No allowances or deductions as permitted as part payment of the minimum fair wage when an employee is required to share a bed.

(g) Any deduction for board or lodging not conforming to the conditions herein set forth leaves the employer liable under those sections of statute forbidding the payment to the employee of a wage less than that due him because of his services. (See G.S.§ 31-68, 31-70, 31-71, 31-73, and 31-74.)

### Section 31-60-4. Physically or mentally handicapped employees.

[This regulation defines a "physically or mentally handicapped person" as a person whose earning capacity is impaired by age or physical or mental deficiency or injury and provide guidelines for a modification of the minimum wage.]

(10) working certificates for minor employees (sixteen to eighteen years). True and accurate records shall be maintained and retained at the place of employment for a period of 3 years for each employee.

(b) The labor commissioner may authorize the maintenance of wage records and the retention of such wages and hour records as outlined either in whole or in part at a place other than the place of employment when it is demonstrated that the retention of such records at the place of employment either

(1) works an undue hardship on the employer without materially benefiting the inspection procedures of the labor department, or

(2) is required for enforcement purposes. Where permission is granted to maintain wage records at other than the place of employment, a record of total daily and weekly hours worked by each employee shall also be available for inspection in connection with such wage records.

(c) In the case of an employee who spends 75% or more of his working time away from his employer's place of business and the maintaining of time records showing the beginning and ending time of each work period for such employees either imposes an undue hardship upon the employer or exposes him to jeopardy because of his inability to control the accuracy of such entries, a record of total daily and total weekly hours will be approved as fulfilling the record keeping requirements of this section. However, in such cases, the original time entries shall be made by the employee in his own behalf and the time entries made by the employee shall be used as the basis for payroll records.

(d) The employer shall maintain and retain for a period of 3 years the following information and data on each individual employed in a bona fide executive, administrative or professional capacity.

(1) His name;
(2) his home address;
(3) the occupation in which he is employed;
(4) his total wages paid each work period;
(5) the date of payment and the pay period covered by payment.

### Section 31-60-14. Employee in a bona fide Executive capacity.

(a) For the purpose of section 31-58 (f) of the general statutes, as amended, "employee employed in a bona fide executive capacity" means any employee (1) whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof; and (2) who customarily and regularly directs the work of two or more other employees therein; and (3) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and (4) who customarily and regularly exercise discretionary powers; and (5) who does not devote more than twenty percent, or, in the case of an employee of a retail or service establishment who does not devote as much as forty percent, of his hours of work in the workweek to activities which are not directly and closely related to the performance of the work described in subdivisions (1) to (4), inclusive, of this section; provided this subdivision shall not apply in the case of an employee who owns at least twenty percent interest in the enterprise in which he is employed; and (6) who is compensated for his services on a salary basis at a rate of not less than four hundred dollars per week, exclusive of board, lodging, or other facilities, except that this subdivision shall not apply in the case of an employee in training for a bona fide executive position as defined in this section if (A) the training period does not exceed six months, and (B) the employee is compensated for his services on a salary basis at a rate not less than three hundred seventy-five dollars per week exclusive of board, lodging, or other facilities during the training period, (C) a complete outline of the training program has been approved by the labor commissioner, and (D) the employer shall pay tuition costs, and fees, if any, for such instruction and reimburse the employee for travel expenses to and from each graduation other than local, where such instruction or training is provided. Any trainee program so approved may be terminated at any time by the labor commissioner upon proper notice. If he finds that the intent of the program as approved has not been carried out. An employee who is compensated on a salary basis at a rate of not less than four hundred seventy-five dollars per week, exclusive of board, lodging, or other facilities, and whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein, shall be deemed to meet all of the requirements of this section.

(b) "Salary basis" means a predetermined amount paid for each pay period on a weekly or less frequent basis, regardless of the number of days or hours worked, which amount is not subject to reduction because of variations in the quality or quantity of the work performed, and which amount has been the subject of an employer-employee arrangement as required by section 31-71f of the Connecticut General Statutes.

(1) Although the amount need not be paid for any workweek in which he performed no work, deductions may only be made in the following five (5) instances:

(A) During the initial and terminal weeks of employment, an employer may pay a proportionate part of an employee's salary for the time actually worked;

(B) Deductions may be made for one or more full days if the employee is absent for personal reasons other than sickness or accident;

(C) Deductions may be made for one or more full days of sickness or disability provided the deduction is made pursuant to a bona fide plan, policy or practice of making deductions from an employee's salary after sickness or disability leave has been exhausted which has been disclosed to the employee in accordance with section 31-71f of the Connecticut General Statutes;

(D) Deductions may be made for absences of less than one full day taken pursuant to the federal family medical leave act, 29 USC 2601 et seq., or the Connecticut family and medical leave act, section 31-51kk et seq., of the Connecticut General Statutes, as permitted by 29 CFR 825.206 or by section 31-51qq-17 of the regulations of Connecticut state agencies; or

(E) Deductions may be made for one or more full days if the employee is absent as a result of a disciplinary suspension for violating a safety rule of major significance. Safety rules of major significance include only those relating to the prevention of serious danger to the employer's premises, or to other employees.

(2) (A) No deduction of any kind shall be made for any part of a workweek absence that is attributable to:

(i) lack of work occasioned by the operating requirements of the employer;
(ii) jury duty, or attendance at a judicial proceeding in the capacity of a witness; or
(iii) temporary military leave.

(B) An employer is permitted to offset payments an employee receives for any of the services described in this subdivision against the employee's regular salary during the week of such absence.

(3) No deduction shall be made for an absence of less than one full day work week unless:

(A) the absence is taken pursuant to the federal family and medical leave act, 29 USC 2601 et seq., or the Connecticut family and medical leave act, section 31-51kk et seq., of the Connecticut General Statutes, as permitted by 29 CFR 825.206 or by section 31-51qq-17 of the regulations of Connecticut state agencies; or

(B) The absence is taken pursuant to a bona fide paid time-off benefits plan that specifically authorizes the substitution or reduction from accrued benefits for the time that an employee is absent from work, provided the employee receives payment in an amount equal to his guaranteed salary.

(4) No deduction of any kind shall be made for an absence of less than one week which results from a disciplinary suspension for violating ordinary rules of employee conduct.

### Section 31-60-15. Employee in a bona fide Administrative Capacity.

(a) For the purpose of said section 31-58 (f), "employee employed in a bona fide administrative capacity" means any employee (1) whose primary duty consists of either (A) the performance of office or non-manual work directly related to management policies or general business operations of his employer or his employer's customers, or (B) the performance of functions in the administration of a

(a) No allowances or deductions in excess of $2.55 a day for full meals as supplied, or in excess of ninety cents for light meals, as supplied, will be permitted as part payment of the minimum fair wage. In any case where full meals are made available to the employee by the employer, the allowance of eighty-five cents for a full meal as defined will be permitted as part payment of the minimum fair wage. In such a case the employee may not elect the light meal in lieu of the full meal. Allowances or deductions may be made only for meals consistent with the employee's work shift when the employee is on duty, and only for meals consistent with a regular meal schedule when the employee is off duty.

(b) An allowance or deduction of not more than $4.00 a week for a private room, or of not more than $3.00 a week for a room shared with others, will be permitted as part payment of the minimum fair wage, provided the allowance or deduction shall be made in accordance with a hiring agreement which provides for such an allowance or deduction. An allowance or deduction for lodging will be permitted as part payment of the minimum fair wage only when the facility supplied conforms to reasonable specifications with respect to safe, privacy, sanitation, heat, light and ventilation. All such facilities shall be open to inspection by an authorized representative of the labor commissioner at any reasonable time. When housing consisting of more than one room is provided for the employee and such circumstances are established in the hiring agreement, the labor commissioner shall establish a reasonable allowance for such housing and in establishing such allowance as it should apply in terms of part 1 of chapter 558 of the general statutes shall be guided by the prevailing rentals for similar quarters including those authorized by the local housing authority in privately or publicly financed housing. No allowances or deductions will be permitted as part payment of the minimum fair wage when an allowance is required to share a bed.

(c) Any deduction for board or lodging not conforming to the conditions herein set forth leaves the employer liable under those sections of statute forbidding the payment to the employee of a wage less than that due him because of his services. (See C.S.§ 31-48, 31-70, 31-71, 31-73, and 31-74.)

### Section 31-60-4. Physically or mentally handicapped employees.

[This regulation defines a "physically or mentally handicapped person" as a person whose earning capacity is impaired by age or physical or mental deficiency or injury and provide guidelines for a modification of the minimum wage.]

### Section 31-60-6. Minors under the age of 18.

(a) For the purposes of this regulation, "minor" means a person at least 16 years of age but not over 18 years of age. To prevent curtailment of employment opportunities for minors, and to provide a reasonable period during which training for adjustment to employment conditions may be accomplished, a minor may be employed at a modification of the minimum fair wage established by subsection (j) of section 31-58 of the general statutes, but at not less than 85% of the minimum wage, for the first 200 hours of employment. When a minor has had an aggregate of two hundred hours of employment, he may not be employed by the same or any other employer at less than the minimum fair wage.

(b) In addition to the records required by section 31-66 of the 1966 supplement to the general statutes, each employer shall obtain from each minor to be employed at a modification of the minimum fair wage rate as herein provided, a statement of his employment prior to his date of accession with his present employer. Such statement of prior employment, supplemented by the present employer's record of hours worked by the minor while in his employ, will be deemed satisfactory evidence of good faith on the part of the employer with respect to his adherence to the provisions of this regulation, provided such record shall be in complete compliance with the requirements of section 31-66 of the general statutes and section 31-60-12.

(c) Deviation from the provisions of this regulation will cancel the modification of the minimum fair wage herein provided for all hours during which the violation prevailed and for such time the minimum wage shall be paid.

### Section 31-60-7. Learners.

[This regulation contains the requirements to apply to the Labor Commissioner for a sub-minimum rate in an occupation which is not apprenticeable.]

### Section 31-60-8. Apprentices.

[Under this regulation, apprentices duly registered by the Connecticut State Apprenticeship Council of the Labor Department may not be employed at less than the minimum wage unless permission has been received from the Labor Commissioner through an application process.]

### Section 31-60-9. Apparel.

For the purpose of this regulation, "apparel" means uniforms or other clothing supplied by the employer for use in the course of employment but does not include articles of clothing purchased by the employee or clothing usually required for health, comfort or convenience of the employee. An allowance (deduction) not to exceed $1.50 one week or the actual cost, whichever is lower, may be permitted to apply as part of the minimum fair wage for the maintenance of wearing apparel or for the laundering and cleaning of such apparel when the service has been performed. When protective garments such as gloves, boots or aprons are necessary to safeguard the worker or prevent injury to an employee or are required in the interest of sanitation, such garments shall be provided and paid for and maintained by the employer without charge upon the employee.

### Section 31-60-10. Travel time.

(a) For the purpose of this regulation, "travel time" means that time during which a worker is required or permitted to travel for purposes incidental to a performance of his employment but does not include time spent traveling from home to his usual place of employment or return to home, except as hereinafter provided in this regulation.

(b) When an employee, in the course of his employment, is required or permitted to travel for purposes which inure to the benefit of the employer, such travel time shall be considered to be working time and shall be paid for as such. Expenses directly incidental to and resulting from such travel shall be paid for by the employer when payment made by the employee would bring the employee's earnings below the minimum fair wage.

(c) When an employee is required to report to other than the usual places of employment at the beginning of his work day, if such an assignment involves travel time on the part of the employee in excess of that ordinarily required to travel from his home to his usual place of employment, such additional travel time shall be considered to be working time and shall be paid for as such.

(d) When at the end of a work day a work assignment at other than his usual place of employment involves, one the part of the employee, travel time in excess of that ordinarily required to travel from his usual place of employment to his home, such additional travel time shall be considered to be working time and shall be paid for as such.

### Section 31-60-11. Hours worked.

(a) For the purpose of this regulation, "hours worked" include all time during which an employee is required by the employer to be on the employer's premises or to be on duty, or to be at the prescribed work place, and all time during which an employee is employed or permitted to work, whether or not required to do so, provided time allowed for meals shall be excluded unless the employee is required or permitted to work. Such time includes, but shall not be limited to, the time when an employee is required to wait on the premises while no work is provided by the employer. Working time in every instance shall be computed to the nearest unit of 15 minutes.

(b) All time during which an employee is required to be on call for emergency service at a location

C.G.S.A. § 31-58 (j)

disciplinary suspension for violating a safety rule of major significance. Safety rules of major significance include only those relating to the prevention of serious danger to the employer's premises, or to other employees.

(2) (A) No deduction of any kind shall be made for any part of a workweek absence that is attributable to:
(i) lack of work occasioned by the operating requirements of the employer;
(ii) jury duty, or attendance as a judicial proceeding in the capacity of a witness; or
(iii) temporary military leave.

(B) An employer is permitted to offset payments an employee receives for any of the services described in this subdivision against the employee's regular salary during the week of such absence.

(3) No deduction shall be made for an absence of less than one full day from work unless:

(A) the absence is taken pursuant to the federal family and medical leave act, 29 USC 2601 et seq., or the Connecticut family and medical leave act, section 31-51kk et seq., of the Connecticut General Statutes, as permitted by the CFR 825-206 or by section 31-51qq-17 of the regulations of Connecticut state agencies; or

(B) the absence is taken pursuant to a bona fide paid time off benefits plan that specifically authorizes the substitution or reduction from accrued benefits for the time that an employee is absent from work, provided the employee receives payment in an amount equal to his guaranteed salary.

(4) No deduction of any kind shall be made for an absence of less than one week which results from a disciplinary suspension for violating ordinary rules of employee conduct.

### Section 31-60-15. Employee in bona fide Administrative Capacity.

(a) For the purpose of said section 31-58 (f), "employee employed in a bona fide administrative capacity" means any employee (1) whose primary duty consists of either: (A) the performance of office or non-manual work directly related to management policies or general business operations of his employer or his employer's customers, or (B) the performance of functions in the administration of a school system or educational establishment or institution, or of a department or subdivision thereof, in work directly related to the academic instruction or training carried on therein; and (2) who customarily and regularly exercises discretion and independent judgment; and (3) (A) who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity, as such terms are defined in section 31-60-14 and 31-60-15, or (B) who performs under only general supervision work along specialized or technical lines requiring special training, experience or knowledge, or (C) who executes under only general supervision special assignments and tasks; and (4) who does not devote more than twenty per cent, or, in the case of an employee of a retail or service establishment who does not devote as much as forty per cent, of his hours worked in the workweek to activities which are not directly and closely related to the performance of the work described in subdivisions (1) to (3), inclusive, of this section; and (5)(A) who is compensated for his services on a salary or fee basis at a rate of not less than four hundred dollars per week exclusive of board, lodging, or other facilities, or (B) who, in the case of academic administrative personnel, is compensated for his services as required by subparagraph (A) of this subdivision or on a salary basis which is at least equal to the entrance salary for teachers in the school system or educational establishment or institution by which he is employed, provided an employee who is compensated on a salary or fee basis at a rate of not less than four hundred seventy-five dollars per week, exclusive of board, lodging, or other facilities, and whose primary duty consists of the performance of work described in subdivision (1) of this section, which includes work requiring the exercise of discretion and independent judgment, shall be deemed to meet all of the requirements of this section.

(b) "Salary basis" [refer to Section 31-60-14.]

(c) "Fee basis" means the payment of an agreed sum for the accomplishment of a single task regardless of the time required for its completion. A fee basis payment shall be permitted only for jobs which are unique in nature rather than for a series of jobs which are repeated an indefinite number of times and for which payment on an identical basis is made over and over again. Payment on a fee basis shall amount to a rate of not less than the rate set forth in subsection (a) of this section.

### Section 31-60-16. Employee in bona fide Professional Capacity.

(a) For the purpose of said section 31-58 (f) "employee employed in a bona fide professional capacity" means any employee (1) whose primary duty consists of the performance of: (A) work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes, or (B) work that is original and creative in character in a recognized field of artistic endeavor, as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training, and the result of which depends primarily on the invention, imagination or talent of the employee or (C) teaching, tutoring, instructing or lecturing in the activity of imparting knowledge while employed and engaged in this activity as a teacher certified or recognized as such in the school system or educational establishment or institution by which he is employed; and (2) whose work requires the consistent exercise of discretion and judgment in its performance; and (3) whose work is predominantly intellectual and varied in character, as opposed to routine mental, manual, mechanical or physical work, and is of such character that the output produced or the result accomplished cannot be standardized in relation to a given period of time; and (4) who does not devote more than twenty percent of his hours worked in the workweek to activities which are not an essential part of and necessarily incident to the work described in subdivision (1) to (3), inclusive, of this section; and (5) who is compensated for his services on a salary or fee basis at a rate of not less than four hundred dollars per week exclusive of board, lodging, or other facilities; provided this subdivision shall not apply in the case of an employee who is the holder of a valid license or certificate permitting the practice of law or medicine or any of their branches and who is actually engaged in the practice thereof, or in the case of an employee who is the holder of the requisite academic degree for the general practice of medicine and is engaged in an internship or resident program pursuant to the practice of medicine or any of its branches, or in the case of an employee and employee engaged as a teacher as provided in subdivision (1) (C) of this section, and provided an employee who is compensated on a salary or fee basis at a rate of not less than four hundred seventy-five dollars per week exclusive of board, lodging or other facilities, and whose primary duty consists of the performance either of work described in subdivision (1) (A) or (C) of this section which includes work requiring the consistent exercise of discretion and judgment, or of work requiring invention, imagination or talent in a recognized field of artistic endeavor, shall be deemed to meet all of the requirements of this section.

(b) "Salary basis" [refer to Section 31-60-14.]

(c) "Fee basis" means the payment of an agreed sum for the accomplishment of a single task regardless of the time required for its completion. A fee basis payment shall be permitted only for jobs which are unique in nature rather than for a series of jobs which are repeated an indefinite number of times and for which payment on an identical basis is made over and over again. Payment on a fee basis shall amount to a rate of not less than the rate set forth in subsection (a) of this section.



**Opportunity • Guidance • Support**

CONNECTICUT
DEPARTMENT
OF LABOR

Gary K. Pechie, Director
Wage and Workplace Standards

(Rev. 02/08)

## Notice to Employer / Employees

HEND0017500

# EXHIBIT HH

# Cannondale Bicycle Corporation

16 Trowbridge Drive
Bethel, CT   06801
(203) 749-7000
Fax (203) 748-4174

172 Friendship Village Road
Bedford, PA 15522
(814) 623-9073
Fax (814) 623-6604

## APPLICATION FOR EMPLOYMENT

Applicants are considered based on qualifications for all positions without regard to race, color, religion, gender, national origin, age, marital or veteran status, or disability, or any other legally protected status.

Date of Application  _3-13-08_

Position(s) Applied For  _ACCOUNTING MANAGER_

Name  _DAMIAN HENDRICKS_

Address  REDACTED

City  REDACTED            State  _ _      Zip Code  REDACTED

Telephone  _203-658-0130_      Cell Phone  _203-417-8276_

Email Address  _dhendricks78@aol.com_

If under the age of 18, can you furnish a work permit?        Y _✓_    N ___

Are you legally eligible for employment in the United States?    Y _✓_      N ___
(Proof of citizenship or immigration status will be required upon employment).

On what date would you be available for work?  _NEGOTIABLE_

Are you available to work   Full Time _✓_    Part Time ____    Temporary ____

Have you been convicted of a felony within the last 7 years?     Y ___   N _✓_

If yes, please explain _____

_____

Are you able to perform the essential functions of the job?  Y _✓_  N ___   if no, are there any reasonable workplace accommodations that can be made to allow you to perform the essential functions of the job?  Y ___   N ___

If yes, please indicate _____

_____



**cannondale**
FEEL IT.



DEFENDANT'S
EXHIBIT
_32_
_7/24/08_

## EMPLOYMENT EXPERIENCE

Start with your present or most recent position. Include military service assignments. May we
contact your present employer? Y ✓  N ___

| | | |
|---|---|---|
| Employer<br>JPMORGAN HEDGE FUND SERVICES | Dates Employed<br>From  To<br>3/07 / PRESENT | Work Performed<br>PREPARE FINANCIAL |
| Address<br>TWO AMERICAN LANE GREENWICH CT 06831 | / | STATEMENTS FOR |
| Job Title<br>FINANCIAL REPORTING ANALYST | Hourly Rate/Salary<br>Starting  Final | VARIOUS HEDGE FUND |
| Supervisor<br>JENNIFER BLACKWELL | / | CLIENTS |
| Reason for Leaving<br>AN OPPORTUNITY TO UTILIZE MY ACCOUNTING SKILLS | / | |
| | / | |

| | | |
|---|---|---|
| Employer<br>GENERAL ELECTRIC | Dates Employed<br>From  To<br>2/05 / 3/07 | Work Performed<br>SOX TESTING AND |
| Address<br>201 MERRITT SEVEN NORWALK CT | / | VARIOUS ACCOUNTING |
| Job Title<br>SENIOR ANALYST | Hourly Rate/Salary<br>Starting  Final | ACTIVITIES |
| Supervisor<br>DIMPLE MAKHIJANI | / | |
| Reason for Leaving<br>RE-ORGANIZATION | / | |
| | / | |

| | | |
|---|---|---|
| Employer<br>PEPSI BOTTLING GROUP | Dates Employed<br>From  To<br>6/04 / 2/05 | Work Performed<br>PROCESSED FIXED |
| Address<br>One PEPSI WAY SOMERS , NY | / | ASSETS ACTIVITIES |
| Job Title<br>ACCOUNTANT | Hourly Rate/Salary<br>Starting  Final | |
| Supervisor<br>LISA DETLOR | / | |
| Reason for Leaving<br>CAREER ADVANCEMENT | / | |
| | / | |

Please explain any gaps in employment:

**If you need additional space, please continue on a separate sheet of paper.**

**Special Skills and Qualifications**
Summarize special skills and qualifications acquired from employment or other experience.
SIX SIGMA CERTIFIED

List professional, trade, business or civic activities and offices held (please exclude memberships which may reveal gender, race, religion, national origin, age, disability or other protected status).

Give name, address, telephone number, and position of three business references.

GREG WHITBY - SUPERVISOR  - 203 - 219 - 9467

CHARLES ROBINSON - FUND ACCOUNTANT - 914 - 882 - 7190

DIMPLE NMAKHIJANI - ASSISTANT CONTROLLER -

# EDUCATION

| | High School | College/University | Graduate/Professional |
|---|---|---|---|
| School Name | Kingston College HS | Monroe College | |
| Years Completed | 9  10  (11)  12 | 1  2  3  (4) | 1  2  3  4 |
| Diploma/Degree | HS DIPLOMA | Bachelor's DEGREE | |
| Describe Course of Study | LIBERAL ARTS | ACCOUNTING | |
| Describe Specialized Training, Apprenticeship, Skills, and Extra-Curricular Activities | | | |

Honors Received:
PRESIDENT'S  LIST  HONORS

State any additional information you feel may be helpful to us in considering your application.

On a voluntary basis, please indicate the following:

Gender:     ✓ Male    ___ Female

Race:     ___ Hispanic or Latino

        ___ White (Not Hispanic or Latino)

        ✓ Black or African American (Not Hispanic or Latino)

        ___ Native Hawaiian or Other Pacific Islander (Not Hispanic or Latino)

        ___ Asian (Not Hispanic or Latino)

        ___ American Indian or Alaska Native (Not Hispanic or Latino)

        ___ Two or More Races (Not Hispanic or Latino)

## Agreement

I certify that answers given herein are true and complete to the best of my knowledge.

I authorize verification of all statements contained in this application for employment as may be necessary in arriving at an employment decision. I understand that this application is not and is not intended to be a contract of employment.

I understand that if offered a position with Cannondale Bicycle Corporation, I may be required to submit to a pre-employment drug screen as a condition of employment.

I understand that false or misleading information given in my application or interview(s) may result in denial of employment or discharge. I understand, also, that I am required to abide by all rules and regulations of the Company.

_Damion John Hendricks_                _4-11-08_

Signature of Applicant                        Date

Rev 01/2008 HRD