## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAMIAN HENDRICKS and | : | CIVIL ACTION NO. |
| MICHAEL MINZIE, | : | 3:08-CV-613 (JCH) |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| J. P. MORGAN CHASE BANK, N.A., | : | DECEMBER 15, 2009 |
| Defendant. | : | |

### RULING RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF DAMIAN HENDRICKS (Doc. No. 59) AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF MICHAEL MINZIE (Doc. No. 63)

### I.    INTRODUCTION

Plaintiffs Damian Hendricks ("Hendricks") and Michael Minzie ("Minzie") bring this action, individually and on behalf of other similarly situated individuals, against defendant J.P. Morgan Chase Bank, North America ("JPMorgan"),[1] their former employer.  Hendricks and Minzie, ex-employees of JPMorgan's "Hedge Fund Services business," allege that they suffered damages because JPMorgan failed to pay them overtime wages, in violation the Fair Labor Standards Act ("FLSA") and Connecticut state law.  29 U.S.C. § 207(a)(1); Conn. Gen. Stat. § 31-76c.  JPMorgan filed motions for summary judgment against Hendricks (Doc. No. 59) and Minzie (Doc. No. 63) on July 10, 2009, arguing that Hendricks, a former "Fund Accounting Specialist," and Minzie, a former "Fund Accounting Analyst,"[2] are exempt from the overtime pay

---

[1]  The court refers to the defendant in the style used by its counsel.

[2]  In its Local Rule 56(a)(1) statement, JPMorgan alleges that Minzie worked as a "Senior Fund Accounting Analyst."  Defendant's Local Rule 56(a)(1) Statement as to Plaintiff Michael Minzie at ¶ 3 (hereinafter "Minzie 56(a)(1)") (Doc. No. 64).  Minzie admitted that allegation in his Local Rule 56(a)(2) statement.  Plaintiff Michael Minzie's Local Rule 56(a)(2) Statement at ¶ 3 (hereinafter "Minzie 56(a)(2)")

1

requirements of the FLSA and Connecticut law because they were employed in a bona

fide professional capacity.  29 U.S.C. § 213(a)(1); Conn. Gen. Stat. § 31-58(f).   In the

alternative, JPMorgan argues that Hendricks and Minzie are exempt from the FLSA's

overtime pay requirements because they were employed in a bona fide administrative

capacity.  Id.

    For the following reasons, the court denies both JPMorgan's Motion for

Summary Judgment as to Hendricks (Doc. No. 59), and JPMorgan's Motion for

Summary Judgment as to Minzie (Doc. No. 63).

## II.    STANDARD OF REVIEW

    In a motion for summary judgment, the burden is on the moving party to

establish that there are no genuine issues of material fact in dispute and that it is

entitled to judgment as a matter of law.  See, e.g., Nebraska v. Wyoming, 507 U.S. 584,

590 (1993); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).  Once

the moving party has met its burden, in order to defeat the motion, the nonmoving party

must "set forth specific facts showing that there is a genuine issue for trial," Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), and present such evidence as would

allow a factfinder to find in his or her favor, Graham v. Long Island R.R., 230 F.3d 34,

38 (2d Cir. 2000).

    When assessing the record, the trial court must resolve all ambiguities and draw

all inferences in favor of the party against whom summary judgment is sought.

(Doc. No. 87).  At oral argument, however, Minzie's counsel clarified that Minzie worked at JPMorgan as a "Fund Accounting Analyst," rather than as a "Senior Fund Accounting Analyst."  As noted in the plaintiffs' Motion for FLSA Collective Action and Rule 23 Class Action (Doc. No. 70), "Fund Accounting Analysts" and "Senior Fund Accounting Analysts" are subject to different salary codes.

Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.  "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party."  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000).  "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the factfinder.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

## III.    STATEMENT OF FACTS[3]

At the heart of this dispute is the issue of the nature of the plaintiffs' job duties as JPMorgan employees.  The parties offer divergent characterizations of the tasks and responsibilities of both Hendricks and Minzie at JPMorgan.  While the differences in the parties' positions will be discussed in further depth in Section IV, infra, this section provides general information about the plaintiffs' roles and backgrounds.

### A.    Plaintiff Hendricks

From approximately March 26, 2007, to April 4, 2008, Hendricks worked for JPMorgan as a "Fund Accounting Specialist" in Greenwich, Connecticut.  Defendant's Local Rule 56(a)(1) Statement as to Plaintiff Damian Hendricks at ¶ 9 (hereinafter "Hendricks 56(a)(1)").  In this role, Hendricks was a member the "Financial Reporting" group, which is part of JPMorgan's "Hedge Fund Services"[4] business.  Id.  As a Fund

---

[3]  The facts contained herein are either undisputed, or construed in the plaintiffs' favor.

[4]  Both sides agree that "hedge fund" is an umbrella term used to describe a certain type of investment company subject to less regulation than a mutual fund.  In general, hedge funds are in the business of investing money on behalf of wealthy investors.  While hedge funds often "invest[] in complicated risk laden products which are very risky in nature,"  Deposition of Michael Minzie at 99, different hedge funds engage in different investment and accounting strategies.

Accounting Specialist, Hendricks earned an annual salary of $68,000 and was also eligible for bonuses.  Id. at ¶ 10.

Hendricks has a bachelor's degree in accounting, and he has accordingly taken advanced accounting classes covering, inter alia, "generally accepted accounting principles" ("GAAP").  Id. at ¶¶ 4-5.  Prior to joining JPMorgan, Hendricks held various accounting-related roles for multiple companies, including Pepsi Bottling Group and General Electric.  Id. at ¶¶ 6-7.  However, Hendricks is not a certified public accountant ("CPA") and has never "taken the CPA exam."  Deposition of Damian Hendricks at 14 (hereinafter "Hendricks Dep.").

At JPMorgan, Hendricks was one of seven Fund Accounting Specialists in the Financial Reporting Group within Hedge Fund Services.  Plaintiff Damian Hendricks's Local Rule 56(a)(2) Statement at ¶ 16 (hereinafter "Hendricks 56(a)(2)") (Doc. No. 90). These seven Fund Accounting Specialists reported to three supervisors and one manager.  Id.   Hendricks's job involved working with "financial statements," which are reports that provide detailed financial information about a particular hedge fund. Hendricks Dep. at 77 (A "[f]inancial statement is just the financial position of the particular fund.  It tells you everything.  Just a transparency of how the fund is doing, whether good or bad financially.").  A financial statement includes multiple components,

4

including a balance sheet,[5] income statement,[6] statement of cashflows,[7] statement of

changes in net assets,[8] financial highlights,[9] schedules of investments, and financial

footnotes.[10]  Hendricks 56(a)(1) at ¶ 12.

As a Fund Accounting Specialist, Hendricks helped to prepare drafts of certain

components of financial statements, including balance sheets, income statements, and

financial footnotes.  See, e.g., Hendricks 56(a)(2) at ¶¶ 11, 23, 34, 51.[11]  As part of this

process, he reviewed financial statements for potential inaccuracies, reviewed financial

footnotes for both substantive correctness and typographical errors, and prepared

responses to questions about financial statements posed by outside auditors.  Id. at ¶¶

23-27, 51, 70.  In general, Hendricks performed his job in accordance with "day-to-day

checklists," which "guide[d] him in completing his daily tasks."  Id. at ¶ 11.

---

[5]  A balance sheet, "also called the Statement of Assets and Liabilities, is a part of the financial statement that provides a snapshot of the economic position of the hedge fund at a particular point in time."  Hendricks 56(a)(1) at ¶ 20.

[6]  An income statement, also "called the Statement of Operations . . . is the profit and loss (P&L) statement for the hedge fund, which puts into the various accounting classifications what happened economically to the hedge fund over the course of the year."  Hendricks 56(a)(1) at ¶ 32.

[7]  The statement of cashflows "show[s] the flow of cash into and out of the hedge fund and involved 'an analysis of the prior year balance sheet against [the] current year's balance sheet.' "  Hendricks 56(a)(1) at ¶ 45 (quoting Hendricks Dep. at 126-127).

[8]  The statement of changes in net assets "show[s] the activity of the hedge fund from the investor side rather than the trading side."  Hendricks 56(a)(1) at ¶ 48.

[9]  The financial highlights section of a financial statement "calculated the performance of the hedge fund for the year by each share class."  Hendricks 56(a)(1) at ¶ 50.

[10]  Financial footnotes "contained detailed descriptions of significant accounting policies applicable to the hedge fund, including those applicable to investment transactions and valuations, swaps, securities sold short, and foreign currency translation."  Hendricks 56(a)(1) at ¶ 52.

[11]  Hendricks' 56(a)(2) makes clear that multiple parties collaborate in completing such "financial statements."  These include not only people in Hendricks' position, but also, inter alia, other members of JPMorgan's "Financial Reporting" group and outside auditors.  See Hendricks 56(a)(2) at ¶¶ 13-14.

Hendricks did not have contact with clients; instead, when client concerns arose, Hendricks and other Fund Accounting Specialists were notified by their JPMorgan supervisors.  Id. at ¶ 62.  In general, Hendricks's supervisors delegated him assignments, reviewed his work, and prepared his performance reviews.  Hendricks Dep. at 65.

B.    Plaintiff Minzie

Minzie worked for JPMorgan in Greenwich, Connecticut, as a "Fund Accounting Analyst" from approximately June 6, 2007, to approximately November 13, 2007.  Minzie 56(a)(1) at  ¶ 18.  Minzie served in this role as a member of the "Portfolio Accounting" group, which is a part of JPMorgan's Hedge Fund Services business.  Minzie's annual salary as a Fund Accounting Analyst was $84,000; Minzie was also eligible for bonuses. Id. at ¶ 20.

Minzie is a graduate of Borough of Manhattan Community College, where he received an associate's degree in finance and banking in 1988.  Id. at ¶ 5. Minzie has also taken classes towards a bachelor's degree with a major in finance and a minor in economics.  Id. at ¶ 7.  In 2002, Minzie received a "Series 7" license for general security representatives.[12]  Id. at ¶ 8.

At the time he was hired by JPMorgan, Minzie had almost 20 years of experience in the financial services industry.   Minzie 56(a)(2) at ¶ 16.  Though he is not a CPA, Minzie has held various "accounting and operational positions" at multiple financial services firms over the course of his career and, prior to joining JPMorgan, he had held

---

[12]   Minzie has also obtained various other professional licenses that are apparently not germane to his position as a Fund Accounting Analyst.  Minzie 56(a)(1) at ¶ 9.

two positions in hedge fund accounting.  Minzie 56(a)(1) at ¶ 11-14; Minzie 56(a)(2) at ¶ 16.  While Minzie acknowledges that he gained both "accounting" and "operations" experience prior to his employment at JPMorgan, Minzie stresses that the bulk of his pre-JPMorgan career was spent in "operations" and not "accounting."  See, e.g., Minzie 56(a)(2) at ¶ 12.

In his role as a Fund Accounting Analyst for JPMorgan, Minzie's responsibilities included generating various reports for hedge fund clients, such as daily Profit and Loss statements[13] and monthly Net Asset Value statements.  Id. at ¶ 22.  Minzie also responded to ad hoc client requests, Minzie 56(a)(1) at ¶ 93, performed "cash reconciliations,"[14] Minzie 56(a)(2) at ¶ 22, and reviewed and investigated certain changes in the prices of securities held by hedge fund clients.  Id. at ¶¶ 49-60.  Minzie's responsibilities often varied depending on the needs of his clients, as "[d]ifferent clients had different deliverables, requested a variety of different services, and had entirely different processes for the delivery of accounting services."  Minzie 56(a)(1) at ¶ 41; Minzie 56(a)(2) at ¶ 41.  Minzie interacted with "third parties such as prime brokers and counterparties," Minzie 56(a)(1) at ¶ 84, and "interacted with clients on a sporadic basis."  Minzie 56(a)(2) at ¶ 87.

## IV.    DISCUSSION

### A.    Federal Claims

The FLSA provides that "no employer shall employ any of his employees . . . for a

---

[13]  A Profit and Loss statement details the activities of a hedge fund client on a particular day, reporting whether that hedge fund made or lost money, and by what amount.  Minzie 56(a)(1) at ¶ 25.

[14]  Cash reconciliations" involve resolving "cash discrepancies between JPMorgan Chase's records and those of the broker."  Minzie 56(a)(1) at ¶ 70.

workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). However, this requirement does not apply to "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). JPMorgan argues that summary judgment must be granted in its favor as to both plaintiffs because both Hendricks and Minzie were employed in a "bona fide professional capacity"[15] and are thus not subject to the overtime pay requirements of the FLSA. In the alternative, JPMorgan argues that Hendricks and Minzie were employed in a "bona fide administrative capacity" and are exempt on that basis.

The court is guided by the principle that, "because the FLSA is a remedial act, its exemptions . . . are to be narrowly construed. . . . Indeed, an employer bears the burden of proving that its employees fall within an exempted category of the Act." Martin v. Malcolm Pirnie, Inc., 949 F.2d 611, 614 (2d Cir. 1991); see also Davis v. J.P. Morgan Chase & Co., __ F.3d __, 2009 WL 3922892, at *1 (2d Cir. 2009) ("Exemptions from the FLSA's requirements 'are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit.' ") (quoting Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960)). In this case, therefore, JPMorgan "must overcome the presumption" that the professional and administrative exemptions to the FLSA do not

---

[15] The professional exemption to the FLSA includes both a "learned professional" exemption and a "creative professional" exemption. 29 C.F.R. §§ 541.301, 541.302. Only the learned professional exemption is at issue here. The creative professional exemption applies to certain employees who work "in a recognized field of artistic or creative endeavor as opposed to routine mental, manual, mechanical or physical work." 29 C.F.R. § 541.302.

8

apply to Hendricks and Minzie.  Martin, 949 F.2d at 614.

It is also worth noting that Hendricks's and Minzie's job titles are not determinative of their status as exempt or non-exempt under the FLSA.  Rather, Hendricks's and Minzie's exempt or non-exempt status depends on the salary of that plaintiff and the nature of his job duties.  See 29 C.F.R. § 541.2 (salary); Cooke v. General Dynamics Corp., 993 F. Supp. 56, 61 (D. Conn. 1997) ("Whether an employee is exempt is determined by the employee's actual work activities, not by the employer's characterization of those activities through a job title or job description.") (citation omitted).  Whether an employee's "particular activities exclude[] them from the overtime benefits of the FLSA is a question of law," Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714 (1986).  At the same time, "[d]isputes regarding the nature of an employee's duties are questions of fact." Jarrett v. ERC Properties, Inc., 211 F.3d 1078, 1081 (8th Cir. 2000); see also Icicle, 475 U.S. at 714 ("The question of how the respondents spent their working time   . . . is a question of fact.").  Indeed, as the Second Circuit has held, "employment for FLSA purposes [is] a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances." Barfield v. New York City Health and Hospitals Corp., 537 F.3d 132, 141-42 (2d Cir. 2008).

        1.      Professional Exemption

Employees who serve "in a bona fide . . . professional capacity" are exempt from the FLSA's overtime pay requirements.  29 U.S.C. § 213(a)(1).   This professional exemption to the FLSA applies to any employee (1) "[c]ompensated on a salary or fee basis at a rate of not less than $455 per week . . . exclusive of board, lodging, or other facilities,"  29 C.F.R. § 541.300(a)(1); and (2) "[w]hose primary duty is the performance

of work . . . [r]equiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction."  29 C.F.R. § 541.300(a)(2)(I).

> a.   Compensation on a Salary Basis

For purposes of the FLSA, an employee is compensated "on a salary basis" if he or she "regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed."  29 C.F.R. § 541.602(a).  Hendricks, as a Fund Accounting Specialist, received an annual salary of approximately $68,000, or approximately $1,307.69 per week.  Hendricks 56(a)(1) at ¶ 10.  Minzie, as a Fund Accounting Analyst, received an annual salary of $84,000, or approximately $1,615.39 per week. Minzie 56(a)(1) at ¶ 20. Both Hendricks and Minzie were additionally eligible for bonuses.  Hendricks 56(a)(1) at ¶ 10; Minzie 56(a)(1) at ¶ 20.  Neither Hendricks nor Minzie disputes that he was compensated "on a salary basis" at a rate of more than $455 per week.  Hendricks Mem. in Opp. at 19; Minzie Mem. in Opp. at 23.  The first element of the professional exemption is thus satisfied as to both Hendricks and Minzie.

> b.   Hendricks's and Minzie's "Primary Duties"

To satisfy the "primary duty test" for the professional exemption set forth in the regulations promulgated by the Department of Labor pursuant to the FLSA, an employee must satisfy a three-pronged test: "(1) The employee must perform work requiring advanced knowledge; (2) The advanced knowledge must be in a field of science or learning; and (3) The advanced knowledge must be customarily acquired by a prolonged

10

course of specialized intellectual instruction."  29 C.F.R. § 541.301(a).  In addition, the

court is mindful that the FLSA regulations define the term "primary duty" as "the

principal, main, major or most important duty that the employee performs."  29 C.F.R. §

541.700(a).  "Employees who spend more than 50 percent of their time performing

exempt work will generally satisfy the primary duty requirement."  Id. at § 541.700(b)

Analysis of what constitutes the plaintiffs' "primary duty" is based on all the facts of the

case, "with the major emphasis on the character of the employee's job as a whole."  Id.

at § 541.700(a).

       In this case, there exist disputed issues of material fact that bear on whether

Hendricks's and/or Minzie's "primary duty" at JPMorgan was "the performance of work

. . . [r]equiring knowledge of an advanced type in a field of science or learning

customarily acquired by a prolonged course of specialized intellectual instruction."  29

C.F.R. § 541.300(a)(2)(I).

                      i.      Work Requiring Advanced Knowledge

       Under the first element of the "primary duty test," JPMorgan bears the burden of

proving that Hendricks's and/or Minzie's primary duty at JPMorgan was "work requiring

advanced knowledge," which means "work which is predominantly intellectual in

character, and which includes work requiring the consistent exercise of discretion and

judgment, as distinguished from performance of routine mental, manual, mechanical or

physical work."  29 C.F.R. § 541.301(b).  Whether Hendricks's and/or Minzie's primary

duty at JPMorgan was "work requiring advanced knowledge" is at the heart of this case.

       The court initially notes that the FLSA regulations address whether accountants

meet the "primary duty" requirement of the professional exemption:

11

> Certified public accountants generally meet the duties requirements for the learned professional exemption. In addition, many other accountants who are not certified public accountants but perform similar job duties may qualify as exempt learned professionals. However, accounting clerks, bookkeepers and other employees who normally perform a great deal of routine work generally will not qualify as exempt professionals.

29 C.F.R. § 541.301(e)(5).  As stated supra, Hendricks and Minzie are not CPAs. Accordingly, the court examines whether Hendricks and Minzie were employees who primarily "perform[ed] similar job duties" to those of a CPA, or whether they "normally perform[ed] a great deal of routine work."  Id.

While JPMorgan argues that Hendricks and Minzie were bona fide professional accountants, Hendricks and Minzie contend that they were, in effect, "internet-age bookkeeper[s]" whose value to JPMorgan depended primarily on their ability to conform to "checklists" created for them by supervisors and to operate computer programs not requiring accounting knowledge.  Hendricks Mem. in Opp. at 6; Minzie Mem. in Opp. at 7.  If Hendricks or Minzie was, in fact, a bona fide professional accountant, then there is little doubt that the professional exemption applies as to that plaintiff.  See e.g. 29 C.F.R. § 541.301(e)(5); Galasso v. Eisman, Zucker, Klein & Ruttenberg, 310 F. Supp. 2d 569, 575 (S.D.N.Y. 2004).  On the other hand, if Hendricks or Minzie was an accounting bookkeeper, then, by the very terms of the regulations, the professional exemption does not apply.  29 C.F.R. § 541.301(e)(5); see also Brock v. Nat'l Health Corp, 667 F. Supp. 557, 566 (M.D. Tenn. 1987) (holding that professional exemption did not apply to "staff accountants" whose primary duties involved "check[ing] reports" and "tabulat[ing] numbers by merely following the prescribed steps set out in a manual"); McComb v. New York & New Brunswick Auto Exp. Co., 95 F. Supp. 636, 642 (D. N.J. 1950) (holding that

12

FLSA exemptions did not apply to plaintiff whose primary duty was to perform "the necessary auditing of the computations made by others and the processing of corrections of errors").

A.     Plaintiff Hendricks

Hendricks and JPMorgan dispute whether Hendricks's primary duty involved the application of accounting knowledge and the use of discretion and judgment.  Some of the evidence supports JPMorgan's view of Hendricks as a bona fide professional accountant.  For example, Hendricks testified that he was responsible for reviewing financial statements, and that he independently performed investigation of such statements if he determined that they might contain inaccuracies.  Hendricks Dep. at 115-16.  Hendricks testified that this process involved the application of accounting principles,  Id. at 120, and that it was his decision when to investigate.  Id. at 96.  Hendricks also testified that the financial statements he prepared were "consistent with U.S. GAAP," and that he had to know "what [GAAP] is" to perform his job.  Hendricks Dep. at 81.  See also Deposition of Carolyn Zaletsky at 126-28 (hereinafter "Zaletsky Dep.").

Other evidence, however, supports Hendricks' position that he was an "accounting bookkeeper," and that a significant portion of his job involved data entry, rather than work requiring accounting knowledge.  See, e.g., Deposition of James Depalo at 65 (hereinafter "Depalo Dep.); Deposition of Kenneth Onorio at 39; Zaletsky

13

Dep. at 230.[16]  Further, Hendricks testified that he was "micro manage[d]" by his

supervisors at JPMorgan, Hendricks Dep. at 48, that he never spoke to clients,

Hendricks Dep. at 132, and that he had no role in, inter alia, interviewing job applicants,

hiring, or supervising others.  Hendricks Dep. at 211.  Hendricks also followed day-to-

day "checklists" and had no authority to change such checklists.  Depalo Dep. at 136.

Moreover, as to JPMorgan's assertion that Hendricks used discretion and judgment to

investigate discrepancies within financial statements, it is unclear whether such a

responsibility constitutes "discretion and judgment" within the meaning of the

professional exemption.  Brock, 667 F. Supp. at 567 ("The fact that mistakes might

appear in . . . ledgers or that there might be apparent mistakes about which the staff

accountant should make inquiry, is not a discretionary matter.  Any ordinary bookkeeper

would make inquiries about abnormalities in the ledgers.").

Moreover, even assuming that *some* "advanced knowledge" was required of

Hendricks at JPMorgan, it is unclear whether Hendricks *primarily* performed work

requiring advanced knowledge.  For instance, even if Hendricks applied his accounting

knowledge to some extent, it is still plausible that Hendricks would not qualify for the

professional exemption if a large portion of his time was spent, for example, operating a

computer software program, the use of which did not require accounting knowledge.

### B.       Plaintiff Minzie

Although the parties agree that one of Minzie's primary duties was the production

---

[16]  Q.   In order to perform as a fund accountant specialist, was it necessary to have knowledge of GAAP?
      A.   No, I think they could have done the work without first hand knowledge of GAAP.

of various types of financial statements, the parties dispute whether this duty required Minzie to have knowledge of accounting.  While some of the evidence supports JPMorgan's view that Minzie prepared Profit and Loss and Net Asset Value reports independently and in accordance with his own accounting knowledge and GAAP, Minzie Dep. at 133, 242,[17] 117, other evidence supports Minzie's argument that the financial statements he generated were purely automated, and that his ability to produce financial statements depended only on his ability to operate accounting software, rather than knowledge of accounting principles, including GAAP.  See Zaletsky Dep. at 169, 230.

The parties also disagree as to the amount of discretion exercised by Minzie as a Fund Accounting Analyst.  As JPMorgan argues, some of the evidence shows that Minzie interacted with JPMorgan clients, Minzie Dep. at 223, used discretion in preparing month-end financial statements, Id. at 117,[18] prepared accounting documents consistent with GAAP, Id. at 133, made decisions as to when to investigate issues related to pricing, Id. at 139, and "position breaks," Id. at 166-68, and developed his own opinions regarding valuation methods for certain financial products.  Id. at 248.  See also Id. at 232 ("Q: Is this a position that you would say is important to exercise good judgment?  A: Yes and no.  I mean basically everything that you need to know is there once you follow what needed to be followed.  You need to still exercise judgment in

---

[17]  Q.   And you were learning a lot about hedge [sic] Fund Accounting and accruals because that's what you were doing in your job, correct?
A.   Correct.

[18]  Q.   Just generally take me through the month end process.  What is the first thing you do in the month end process?
A.   There is no first thing.  Basically you have to do what you feel is important at the time, whether you have to file a statement or whatever you got, you try to work on it first. . . .
Q.   You decide what's most important?
A.   Right.   Minzie Dep. at 122.

everything you do as far as identifying issues."). Further, Minzie himself testified that job

was not "routine" in nature. See id. at 222-24.

Other evidence supports Minzie's position. For example, Minzie testified that he

was "micro-managed" by certain supervisors, Id. at 223; that his interactions with clients

was sporadic, Id. at 214; that preparation of financial statements involved "plugging stuff

into the spread sheets," Id. at 115; that he did not assign work to other JPMorgan

employees, Id. at 259; that he did not review others' work, Id. at 255, and that he

conformed to a day-to-day "checklist" that he had no power to alter. Depalo Dep. at 136.

Moreover, as with Hendricks, there is an additional question of fact as to whether,

even if Minzie was required to perform *some* work requiring advanced knowledge,

Minzie *primarily* performed work requiring advanced knowledge.

ii.    Field of Science or Learning

The second element of the "primary duty test" is whether the "advanced

knowledge" required for the work performed by the employee is in a "field of science or

learning." Under FLSA regulations, "the traditional professions of law, medicine,

theology, accounting . . . and other similar occupations " are "fields of science or

learning." 29 C.F.R. § 541.301(c). The parties do not appear to disagree that

accounting, including hedge fund accounting, is a field of science or learning within the

meaning of the FLSA regulations. In this case, the parties' disagreement is ultimately as

to the nature of plaintiffs' *roles* within the larger field of accounting, not as to the nature

of hedge fund accounting itself. It is clear that if Hendricks' or Minzie's role required

advanced knowledge in the field of accounting, then the second element of the "primary

duty test" would be satisfied as to that plaintiff. However, because there are disputed

16

issues of material fact as to whether Hendricks' or Minzie's role as a Fund Accounting Analyst required "advanced knowledge" in the first place, the court cannot say that the second element of the "primary duty" test is satisfied.

iii.    Customarily Acquired by a Prolonged Course of
Specialized Intellectual Instruction

The third element of the "primary duty test" is whether the "advanced knowledge" required for the work performed by the employee is "customarily acquired by a prolonged course of specialized intellectual instruction." Under the FLSA regulations, this element is satisfied if "specialized academic training is a standard prerequisite for entrance into the profession. 29 C.F.R § 541.301(d). The element is not satisfied if the occupation at issue "customarily may be performed with only the general knowledge acquired by an academic degree in any field." Id.

JPMorgan argues that this element of the primary duty test is satisfied based on Hendricks' and Minzie's qualifications. Hendricks has a bachelor's degree in accounting, and Minzie received an associate's degree in finance and banking and a Series 7 license for general securities representatives.

However, Hendricks's and Minzie's particular qualifications are not determinative of whether this element of the "primary duty" test is met. The relevant inquiry as to this element is not whether Minzie or Hendricks attained a particular level of education or training, but whether "most employees" in their positions "have acquired their skill by experience rather than by advanced specialized intellectual instruction." 29 C.F.R. § 541.301(d); Piscione v. Ernst & Young, L.L.P., 171 F.3d 527, 545 (7th Cir. 1999) ("[T]he determinative factor in analyzing whether an employee falls within this prong is the job

17

requirements rather than the education the employee received.") (citing Dybach v. State of Fla. Dep't of Corrections, 942 F.2d 1562, 1565 (11th Cir. 1991)).  Courts that have addressed this element of the "primary duty" test have reached different conclusions in different factual contexts.  See Chatfield v. Children's Services, Inc., 555 F. Supp. 2d 532, 535-36 (E.D.P.A. 2008) (collecting cases).

Some of the evidence in this case appears to show that, even if the plaintiffs' themselves were hired with accounting experience, specialized training was not required to perform their job responsibilities.  See, e.g., Minzie Dep. at 63, 226; Depalo Dep. at 125; see also Dybach, 942 F.2d at 1565-66 (11th Cir. 1991) (holding that the professional exemption did not apply to a probation officer whose job required a college or advanced degree, but not in any "specialized field of knowledge").  There are disputed issues of material fact as to the issue of what specialized training was required to perform Hendricks's and Minzie's jobs at JPMorgan.

c.    Piscione v. Ernst & Young, L.L.P.

It bears noting that this case is distinguishable from Piscione, 171 F.3d 527, which JPMorgan has cited repeatedly in support of its motions for summary judgment in both its briefs and at oral argument.  See, e.g., Minzie Reply at 25.  In Piscione, a FLSA case brought by a "consultant" in the employer's "Human Resources Consulting Group," the Seventh Circuit affirmed the district court's grant of summary judgment in favor of the employer.  171 F.3d at 531.  While the plaintiff maintained that "genuine issues of material fact exist in the record," the Circuit held that the grant of summary judgment in the employer's favor was appropriate because such issues of fact had been "manufactur[ed]" by the plaintiff "by submitting an affidavit that contradict[ed] an earlier

18

deposition." Id. at 532.  In his affidavit, the Piscione plaintiff "characterized his work as devoid of any need for judgment or discretion."  Id. at 536.  The affidavit stated, for example, that the plaintiff "could not hire or fire," did not train or supervise lower-level employees, and did not participate in "client management."  Id.  The plaintiff's deposition testimony, on the other hand, indicated that Piscione, inter alia, supervised "several employees," was "deeply involved in training a new hire," "evaluated potential employees after interviewing them and then ma[de] recommendations to hire them," and "managed at least fifteen clients at a given time."  Id. at 537-39.

Piscione is distinguishable from the instant case in two principal ways.  First, unlike in Piscione, the issues of material fact in this case have not been "manufactured" through affidavits that sharply contradict deposition testimony.  Indeed, the affidavits submitted by Hendricks and Minzie are largely consistent with their deposition testimony in this case, which has been cited above.[19]  Second, there is nothing in the record suggesting that Hendricks and Minzie had even close to the level of responsibility held by the Piscione plaintiff, who testified that he managed dozens of clients and supervised teams of lower-level employees.

---

[19] At oral argument, JPMorgan's counsel stated that Hendricks and Minzie admitted in their depositions that knowledge of accounting principles was necessary to perform their jobs.  However, the relevant portions of the record appear to the court to be somewhat ambiguous on this point.  The strongest evidence in JPMorgan's favor seems to be Hendricks's statement that "[y]ou have to know what [GAAP] is and the basic knowledge."  Hendricks Dep. at 81. In addition, both Hendricks and Minzie also admitted that the financial statements they prepared were consistent with GAAP.  Hendricks Dep. at 81; Minzie Dep. at 133.

However, the fact that the financial statements prepared by Hendricks and Minzie were ultimately consistent with GAAP, and the fact that Hendricks had to know "what [GAAP] is," do not necessarily entail the conclusion that Hendricks and Minzie needed to actually apply accounting principles in their jobs at JPMorgan. In other words, it seems entirely possible that, even if Hendricks and Minzie were required to be familiar with accounting jargon (i.e., "know what [GAAP] is"), they may not have actually been required to utilize GAAP in their particular roles.  As Minzie testified, when asked about his use of GAAP, "[i]t is just basically supervisors, you know, overseeing that process."  Minzie Dep. at 133.

d.      Summary

The court stresses that whether the professional exemption applies to Hendricks

or Minzie is ultimately an issue of law.  However, that legal issue cannot be resolved at

this stage of the litigation, because there exist disputed issues of material fact as to what

primary duties actually comprised Hendricks's and Minzie's job responsibilities as

JPMorgan employees.  Summary judgment is therefore denied on the ground of the

professional exemption.

2.      Administrative Exemption

In the alternative, JPMorgan argues that summary judgment must be granted in

its favor because Minzie satisfies the administrative exemption to the FLSA. 29 U.S.C. §

213(a)(1) (exempting from the FLSA's overtime pay requirements "any employee

employed in a bona fide . . . administrative . . . capacity").   The administrative exemption

to the FLSA applies to any employee, (1) "[c]ompensated on a salary or fee basis at a

rate of not less than $455 per week . . . exclusive of board, lodging, or other facilities,"

29 C.F.R. § 541.300(a)(1); (2) "[w]hose primary duty is the performance of office or non-

manual work directly related to the management or general business operations of the

employer or the employer's customers; and (3) [w]hose primary duty includes the

exercise of discretion and independent judgment with respect to matters of significance."

29 C.F.R. § 541.200(a).

a.      Compensation on a Salary Basis

For the reasons set forth in Section III.A.i.a, supra, there are no disputed issues

of material fact regarding whether Hendricks or Minzie fails to satisfy the "compensation

on a salary basis" requirement of the administrative exemption to the FLSA.  This

20

element is satisfied as to both Hendricks and Minzie.

>　　b.　　Performance of Office or Non-Manual Work Directly Related
>　　　　　to the Management or General Business Operations of the
>　　　　　Employer or Employer's Customers

There is no dispute in this case that Hendricks and Minzie performed "office or non-manual work."  29 C.F.R. § 541.200(a).  However, to satisfy this element of the administrative exemption, "an employee must perform work directly related to assisting with the running or servicing of the business,[20] as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  29 C.F.R. § 541.201(a).  "The question of whether employees' work is directly related to . . . general business operations is a fact-specific inquiry requiring the court to 'construe the statutes and applicable regulations as a whole,' . . . while keeping in mind that 'each case must be examined individually,' " Ruggeri v. Boehringer Ingelheim Pharmaceuticals, Inc., 585 F. Supp. 2d 254, 264 (D. Conn. 2008) (quoting Bothell v. Phase Metrics, Inc., 299 F.3d 1120, 1127 (9th Cir. 2002)); DOL Final Rule, 69 Fed.Reg. at 22,142.   As the Second Circuit has recently held, "[w]hat determines whether an [employee] performed production or administrative functions is the nature of her duties, not the physical conditions of her employment."  Davis, 2009 WL 392289, at *3.

As JPMorgan points out, the FLSA regulations state that accounting is generally within the ambit of the administrative exemption to the FLSA:

Work directly related to management or general business operations includes, but

---

[20]  Under the regulations, "the business" means the business of either the employer or its customers.  29 C.F.R. § 541.200(a)(2).

> is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities. Some of these activities may be performed by employees who also would qualify for another exemption.

29 C.F.R. § 541.201(b). Moreover, the FLSA regulations specifically address whether employees of financial services companies qualify for the administrative exemption:

> Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products. However, an employee whose primary duty is selling financial products does not qualify for the administrative exemption.

29 C.F.R. § 541.203(b). However, this prong is satisfied only if the "employee participates in 'the running of a business, and not merely . . . the day-to-day carrying out of its affairs.' "[21]  Davis, 2009 WL 3922892, at *5 (quoting Bratt v. County of Los Angeles, 912 F.2d 1066, 1070 (9th Cir.1990)).

Despite JPMorgan's apparent assertions to the contrary, the fact that Hendricks and Minzie worked in the accounting sector is not dispositive to this court's analysis under the administrative exemption.  As the Second Circuit has recently stated, "context matters."  Davis, 2009 WL 3922892, at *7.  The Davis court noted the "[t]he administrative/production dichotomy" suggested by the regulations underlying the

_____

[21] The Davis case was decided on the basis of pre-2004 FLSA regulations, which are inapplicable to the instant case.  See Davis, 2009 WL 3922892 at *2 n.2.  However, the Davis court's discussion of this aspect of the administrative exemption is relevant to this case, because this aspect of the administrative exemption was not changed in the regulations promulgated in 2004.  Compare 29 C.F.R. 541.200(2) (2004 regulations) with  29 C.F.R. § 541.2(a) (pre-2004 regulations).

FLSA's administrative exemption.  Id. at *2.  However, the Davis court also emphasized that, whether a particular employee falls on the "administrative" or "production" side of that dichotomy depends on relationship of the employee's position to the "primary output" of the business in which the employee works.  Id. at *5.

The Second Circuit determined that the bank underwriters in Davis fell on the "production" side of the aforementioned "dichotomy," because those underwriters were "the workers who produce the services--loans--that are 'sold' by the business to produce its income."[22]  See id. at *7.  In this case, similarly, Hendricks and Minzie worked in a business where the "product" that JPMorgan sold to clients was fund accounting services.  The question thus becomes whether Hendricks or Minzie "participate[d] in "the running of [JPMorgan's clients'] business[es], and not merely . . . the day-to-day carrying out of [their] affairs."  Id. at *6.[23]

There are disputed factual issues that bear on whether Hendricks and Minzie were merely "internet-age bookkeeper[s]" whose positions did not require knowledge of accounting.  If Hendricks and Minzie were, in fact, accounting bookkeepers, then they would not qualify for the administrative exemption to the FLSA.  See, e.g., Clark v. J.M. Benson Co., Inc., 789 F.2d 282, 286-87 (4th Cir. 1986) (stating that, in the context of the pre-2004 regulations, bookkeepers do not "perform[] work directly related to

---

[22] The Davis court made the following observation about cases from other jurisdictions in which employees were found to be eligible for the administrative exemption: "In virtually all of these cases, the employee in question exercised managerial tasks beyond assessing credit risk, or assessed risks in a firm whose primary business was not the extension of credit."  Davis, 2009 WL 3922892, at *7.

[23] At oral argument, JPMorgan's counsel conceded that Hendricks and Minzie did not participate in the running of JPMorgan's fund accounting business.  The question, therefore, is only whether Hendricks and Minzie participated in the running of JPMorgan's clients' businesses.

management policies or general business operations"). Some of these disputed factual issues are described in section IV.A.1, supra.[24]

>        c.        Exercise of Discretion and Independent Judgment

To satisfy this prong of the administrative exemption, JPMorgan's argues that Hendricks' and Minzie's job responsibilities need only "include" the exercise of discretion and independent judgment.  See, e.g., Minzie Reply at 6; 69 Fed.Reg. 22,122, 22,142-43 (Apr. 23, 2004) (stating that, under 29 C.F.R. § 541.202(a), "the primary duty must 'include' the exercise of discretion and independent judgment—rather than 'customarily and regularly' exercise discretion and independent judgment"). However, the court need not reach this prong of the administrative exemption, due to the disputed issues of material fact concerning the second element of this exemption.

>        d.        Summary

As with the professional exemption, the court stresses that whether the administrative exemption applies to Hendricks or Minzie is ultimately an issue of law. However, that legal issue cannot be resolved at this stage of the litigation, because there exist disputed issues of material fact over whether Hendricks's or Minzie's "primary duty [was] the performance of office or non-manual work directly related to the management or general business operations of [JPMorgan's] customers."  29 C.F.R. § 541.200(a). The court therefore denies the motions for summary judgment on the ground of the

---

[24] To highlight just one example, the Second Circuit held in Davis that employees falling on the administrative side of the "administrative/production dichotomy" are those who perform "substantial advisory duties."  Id. at *4.  However, Hendricks testified that he never spoke to clients while employed at JPMorgan.  Hendricks Dep. at 132.  The court finds it difficult to believe that Hendricks could have performed "substantial advisory duties" or "participate[d] in "the running of [JPMorgan's clients'] business[es]" if he, in fact, never spoke to those clients.  Cf. Piscione, 171 F.3d at 539 (employee who qualified for the administrative exemption "managed at least fifteen clients at a given time").

administrative exemption.

B.    State Claims

The Connecticut Minimum Wage Act contains provisions that parallel the federal overtime pay requirements of the FLSA.  See Conn. Gen. Stat. § 31-76c ("No employer, except as otherwise provided herein, shall employ any of his employees for a workweek longer than forty hours, unless such employee receives remuneration for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."); Conn. Gen. Stat. § 31-58 (excluding from the overtime provisions of Conn. Gen. Stat. § 31-76c those "employed in a bona fide executive, administrative or professional capacity."); Conn. Agencies Regs. § 31-60-16(a) (defining the professional exemption); Conn. Agencies Regs. § 31-60-15 (defining the administrative exemption).[25]

Under Connecticut law, as under federal law, the "burden rests on the employer to establish that the employee comes within the statutory exemption[s]" to Conn. Gen. Stat. § 31-76c.  Butler v. Hartford Technical Institute, Inc., 243 Conn. 454, 466 (1997). Moreover, the "nature of [an employee's] duties" is the "primary factor" for a court to consider in determining whether an employee is exempt from Connecticut overtime provisions.  Id. at 467.[26]  Indeed, the Connecticut Supreme Court has indicated that federal precedent can be used to interpret Connecticut laws that are analogous to

_____

[25]  One difference between the FLSA and Connecticut state law is that the salary threshold for the professional and administrative exemptions to the Connecticut law is $475 per week; the federal threshold, by contrast, is $455 per week.  In this case, both plaintiffs indisputably make more than $475 per week.  See Section IV.A.1.a, supra.

[26]  While the Butler court discussed only the administrative exemption, there is no reason to believe that its analysis is inapplicable to the Connecticut state professional exemption.

provisions contained in the FLSA.  Roto-Rooter Services Co. v. Dep't of Labor, 219 Conn. 520, 528 n.8 (Conn. 1991).

Because there are disputed issues of material fact in this case as to the nature of Hendricks's and Minzie's primary job duties, the court denies JPMorgan's motions for summary judgment (Docs. No. 59 and 63) on the plaintiffs' state law claims.

## V.    CONCLUSION

For the foregoing reasons, JPMorgan's motions for summary judgment as to Damian Hendricks and Michael Minzie (Docs. No. 59 and 63) are **DENIED**.


**SO ORDERED.**

Dated at Bridgeport, Connecticut this 15th day of December, 2009.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge