**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DAMIAN HENDRICKS and | : | CIVIL ACTION NO. |
| MICHAEL MINZIE, | : | 3:08-CV-613 (JCH) |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| J. P. MORGAN CHASE BANK, N.A., | : | DECEMBER 15, 2009 |
| Defendant. | : | |

**RULING RE: PLAINTIFFS' SECOND MOTION TO AMEND COMPLAINT (Doc. No. 58) AND MOTION FOR FLSA COLLECTIVE ACTION AND  RULE 23 CLASS CERTIFICATION (Doc. No. 70)**

**I.     INTRODUCTION**

The plaintiffs in this action, Damian Hendricks ("Hendricks") and Michael Minzie ("Minzie"), are former employees of the defendant, J.P. Morgan Chase Bank, N.A. ("JPMorgan").[1]  Both Hendricks and Minzie worked as "fund accountants" within JPMorgan's "Hedge Fund Services" business in Greenwich, Connecticut, between 2007 and 2008.  Hendricks, a former "Fund Accounting Specialist," and Minzie, a former "Fund Accounting Analyst," brought this lawsuit, individually and on behalf of other similarly situated fund accountants, alleging that JPMorgan violated the Fair Labor Standards Act ("FLSA") and Connecticut state law by failing to pay them overtime wages.  29 U.S.C. § 207(a)(1); Conn. Gen. Stat. § 31-76c.

On July 8, 2009, Hendricks and Minzie moved the court to amend their complaint for a second time.  See Second Motion to Amend (Doc. No. 58).  On July 14, 2009,

---

[1]The court refers to the defendant in the style used by its counsel.

Hendricks and Minzie moved the court to certify an FLSA collective action under 29

U.S.C. § 216(b), and a class action under Federal Rule of Civil Procedure 23(b)(3).

See Pl.'s Mot. for FLSA Collective Action and Rule 23 Class Certification (Doc. No. 70).

Hendricks and Minzie allege that there are "at least 335" putative class members in this

case who were misclassified by JPMorgan as exempt from the overtime pay

requirements of the FLSA and are consequently owed compensation for work

performed in excess of 40 hours per week.  Mem. in Supp. at 3.

     For the reasons that follow, the court grants in part the Second Motion to Amend.

The court denies the Motion for an FLSA Collective Action and a Rule 23 Class Action.

## II.    SECOND MOTION TO AMEND COMPLAINT (Doc. No. 58)

     On December 16, 2008, Hendricks filed a Motion to Amend his Complaint, (Doc.

No. 37), which this court granted on December 18, 2008 (Doc. No. 39).  On July 8,

2009, Hendricks and Minzie filed a Second Motion to Amend their Complaint (Doc. No.

58).  For the reasons contained herein, that Motion is granted in part.

     The Second Motion to Amend seeks "to narrow and redefine the putative class."

Memorandum in Support of Second Motion to Amend at 1 (Doc. No. 58).  Following this

court's grant of Hendricks's first Motion to Amend, the class was defined as:

> All current and former employees of Defendant who were employed as Fund
> Accountants, who worked at least one hour of overtime, and who were subject to
> Defendant's conduct of having designated them as exempt from overtime and
> thereby denying them overtime premiums for their overtime work.

See Second Amended Class Action Complaint at ¶ 6 (Doc. No. 40).  The Second

Motion to Amend seeks to narrow the class definition to:

> All current and former employees of JP Morgan who were employed as Fund

> Accountants, with job codes OP0908 (salary code 502) and job code OP0909 (salary code 601) who worked at least one hour of overtime, and who were subject to Defendant's misclassification of them as exempt, thereby denying them overtime compensation for all hours worked each week in excess of 40.

See Id. at 7.  The Second Motion to Amend also seeks to add claims on behalf of members of the proposed class under Massachusetts Law.  See Proposed Third Amended Class Complaint at 10, 11 (Count Five and Count Six) (Pls.' Exh. A).

To the extent the Second Motion to Amend seeks to narrow the definition of the proposed class, the Second Motion to Amend is granted as unopposed.  See Memorandum in Opposition to Second Motion to Amend at 2 ("To the extent Plaintiffs seek to narrow the definition of the putative class, JPMorgan Chase has no objection to such revision, while reserving all arguments that this case should not proceed as a class or collective action.") (Doc. No. 83).

However, the Second Motion to Amend is denied as to all other proposed amendments to the Complaint.  The court finds that allowing the plaintiffs to assert new claims at this stage of the litigation would prejudice JPMorgan.  As to a motion for leave to replead, prejudice occurs where "the assertion of the new claim would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction."  Id.  "[A] proposed amendment [is] especially prejudicial . . . [when] discovery had already been completed and [non-movant] ha[s] already filed a motion for summary judgment."  Krumme v. WestPoint Stevens Inc., 143 F.3d 71, 88 (2d Cir. 1998) (quotation marks and citation omitted).  The discovery deadline has already passed in this case, and JPMorgan has

already moved for summary judgment.  The court concludes that allowing Hendricks and Minzie to bring new claims would cause prejudice to JPMorgan by requiring them to expend significant additional resources on this case, and by significantly delaying its resolution.

For the foregoing reasons, plaintiffs' Second Motion to Amend is granted in part. The Motion is granted as to the plaintiffs' proposed changes to the class definition.  The Motion is denied in all other respects.

## III.  MOTION FOR FLSA COLLECTIVE ACTION AND RULE 23 CLASS CERTIFICATION (Doc. No. 70)

### A.    Background

#### 1.    Fund Accounting

The term "fund accounting" describes a service offered by JPMorgan to various types of "fund" clients, including, but not limited to, hedge funds, private equity funds, pension funds, and mutual funds.  Mem. in Supp. at 5.  The plaintiffs define "fund accounting" as "customized, full service back-office support tailored to meet the needs of global asset managers, trustees and plan sponsors."  Id. at 4 (citing Pl.'s Exh. B).  As this definition suggests, different fund clients may request different types of fund accounting services depending on their particular needs.  See id. at 9.  Indeed, "every client and every fund structure is uniquely negotiated and structured."  Id.

While Hendricks and Minzie refer to the members of the proposed class in this case as "fund accountants," see, e.g., id. at 3, "fund accountant" is not a formal title, nor are all "fund accountants" certified public accountants ("CPAs").[2]  Rather, the parties

---

[2]  Some fund accountants, however, are CPAs.  See, e.g., Declaration of Paul Cordasco at ¶ 4.

use "fund accountant" as an umbrella term to describe JPMorgan employees who work in the field of fund accounting.  See, e.g., Def's Exh. EE.[3]  At JPMorgan, Hendricks's formal title was "Fund Accounting Specialist" (salary code 502) and Minzie's was "Fund Accounting Analyst" (salary code 601).  Mem. in Supp. at 3.  While both Hendricks and Minizie worked as fund accountants in JPMorgan's "Hedge Fund Services"[4] business, fund accountants with these same titles and salary codes, who comprise the proposed class in this case, also worked in other sectors, including those performing fund accounting services for mutual funds, pension funds, and private equity funds.  See Pl's. Exh. C.

> 2.     The FLSA

The FLSA states that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).  This overtime pay requirement does not apply to "any employee employed in a bona fide executive, administrative, or professional capacity."  29 U.S.C. § 213(a)(1).

Among its fund accounting employees, JPMorgan currently classifies "Fund Accounting Associates" and "Senior Fund Accounting Associates" (salary codes 404

---

[3]  According to JPMorgan, the term "fund accountant" most commonly refers to lower-level fund accountants, who are currently eligible for overtime under JPMorgan's company policy.  Mem. in Opp. at 8.  See also Deposition of James DePalo at 107, 161.  However, both parties at times use the term "fund accountant" to describe generally the set of employees working in the field of fund accounting.  See, e.g., Mem. in Supp. at 3; Mem. in Opp. at 6.

[4]  A "hedge fund" is a type of investment firm that is subject to less regulation than a mutual fund.  Hedge funds engage in a diverse array of investing strategies.

and 406, respectively) as eligible to receive overtime pay.  Declaration of James
DePalo at ¶ 33.  All other fund accountants--including "Fund Accounting Specialists"
(salary code 502), "Fund Accounting Analysts" and "Senior Fund Accounting Analysts"
(salary codes 601 and 602, respectively), "Fund Accounting Advisors" (salary code
603), and "Fund Accounting Managers" (salary code 604)--are currently classified as
exempt from the FLSA's overtime pay requirement.  Mem. in Supp. at 8.  Unlike level
404 and 406 fund accountants, these employees do not receive compensation for work
in excess of 40 hours per week.  Id.  In this case, the plaintiffs allege that JPMorgan
misclassifies Fund Accounting Specialists (job code OP0908, salary code 502)
(hereinafter "502 Fund Accountants"), and Fund Accounting Analysts (job code
OP0909, salary code 601) (hereinafter "601 Fund Accountants") as exempt from
overtime pay under the FLSA.

        3.     The Plaintiffs' Claims

     Hendricks and Minzie argue that 502 and 601 Fund Accountants are entitled to
overtime compensation under the FLSA because such employees are, in effect, "low-
level functionaries" whose jobs do not require the consistent exercise of discretion and
judgment.  Mem. in Supp. at 9.  Hendricks and Minzie allege that, while they worked at
JPMorgan, they were "micromanaged" and subject to "day-to-day checklists" prepared
by "management."  Id. at 9-10.  They emphasize that knowledge of generally accepted
accounting principles ("GAAP"), SEC regulations, or tax regulations was not required to
perform the job duties required of the proposed class members.  Id. at 16.  Instead,
they contend that the "primary focus" of the proposed class members' "job function is to
acquire competency in the various applications of assigned accounting software

6

programs." Id. at 11.  In sum, the plaintiffs argue that, because the members of the

proposed class "virtually perform[ed] the same job functions and responsibilities as the

nonexempt 404/406 Fund Accountants," the class should be certified.  Id. at 9.

Hendricks and Minzie maintain that the members of the proposed class worked

more than forty hours a week on a regular basis.  Id. at 16-17.  While Hendricks and

Minzie concede that "JPMorgan does not maintain any time records, documenting the

daily arrival/departure times of 502/601 Fund Accountants," id. at 17, they argue that

they were "regularly required to work in excess of 40 hours per week," and that "this

business practice was neither isolated nor limited to Plaintiffs."  Id.  at 16-17.  In

particular, Hendricks and Minzie allege that potential class members often worked in

excess of 40 hours per week "[d]uring busy season," from mid-January to early April.

Id. at 17.

      B.    <u>Discussion</u>

          1.    Class Definition

The plaintiffs seek an FLSA collective action and Rule 23(b)(3) class action on

behalf of:

> All current and former employees of JP Morgan who were employed as Fund
> Accountants, with job codes OP0908 (salary code[ ]502) and job code OP0909
> (salary code 601) who worked at least one hour of overtime, and who were
> subject to Defendant's misclassification of them as exempt, thereby denying
> them overtime compensation for all hours worked each week in excess of 40.

Mem. in Supp. at 2.  Importantly, the potential class of 502 and 601 Fund Accountants

includes employees not only of JPMorgan's Hedge Fund Services Business, but also

employees of Mutual Fund Services, Private Equity Fund Services, and other sectors of

the firm.

As to the Motion to Certify an FLSA Collective Action, JPMorgan argues that the Motion should be denied because the potential class members are not "similarly situated."  Mem. in Opp. at 43.  As to the Motion for Class Certification under Rule 23, JPMorgan argues the plaintiffs have failed to meet the standards required by Fed R. Civ. P. 23(a) and 23(b)(3).  See id. at 13-14.  The thrust of JPMorgan's position, as to the plaintiffs' claims under both the FLSA and Rule 23, is that a class or collective action is an inappropriate method for resolving this dispute because members of the potential class "worked in numerous individualized roles, in numerous different business lines."  Id. at 1.

2.      FLSA Collective Action

The FLSA permits employees to file an action on behalf of themselves, as well as on behalf of "other employees similarly situated," for violations of minimum wage and overtime provisions of the FLSA.  29 U.S.C. § 216(b).  "[S]uch a joint, or collective, action requires potential plaintiffs to opt in to the suit in order to benefit from any judgment."  Neary v. Metro. Prop. & Cas. Ins. Co., 517 F. Supp. 2d 606, 618 (D. Conn. 2007) (quotation marks omitted) (citing 29 U.S.C § 216(b)).  While "district courts have the discretionary power to authorize the sending of notice to potential class members in a collective action brought pursuant to [section] 216(b) of the FLSA," Holbrook v. Smith and Hawken, Ltd., 246 F.R.D. 103, 105 (D. Conn. 2007) (quoting Hoffmann v. Sbarro, Inc., 982 F. Supp. 249, 261 (S.D.N.Y. 1997)), the Second Circuit has not articulated a test for certification of an FLSA collective action.  See, e.g., Mike v. Safeco Ins. Co. of Am., 274 F. Supp. 2d 216, 220 n. 6 (D. Conn. 2003).

In deciding whether to certify an FLSA collective action, district courts in this

8

circuit have typically undertaken a two-stage inquiry. See, e.g., Neary, 517 F. Supp. 2d at 618. The court first determines whether the proposed class members are similarly situated. Id. If the court concludes the proposed members are similarly situated, then the collective action will be conditionally certified. Id. The second step of the analysis "occurs upon completion of discovery." Id. "A court, often prompted by a motion for decertification by the defendant, will examine all the evidence then in the record to determine whether there is a sufficient basis to conclude that the proposed class members are similarly situated." Cuzco v. Orion Builders, Inc., 477 F. Supp. 2d 628, 632 (S.D.N.Y. 2007); see also Holbrook, 246 F.R.D at 106. The court's findings on the motion for decertification constitutes the second step in the two-part inquiry.

Several district courts, including one in this district, and the Tenth Circuit, have adopted an ad hoc review of certain factors at the second stage, including "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations." See, e.g., Torres v. Gristede's Operating Corp., 2006 U.S. Dist. LEXIS 74039, at *30 (S.D.N.Y. Sept. 28, 2006); see also Thiessen v. GE Capital Corp., 267 F.3d 1095, 1103 (10th Cir. 2001); Wilson v. Guardian Angel Nursing, Inc., 2009 U.S. Dist. LEXIS 26126, at *14 (M.D. Tenn. Mar. 24, 2009). Notably, even at the second step of the certification stage, courts do not address the merits of the plaintiffs' claims. Such an inquiry is irrelevant at the certification stage, as long as plaintiffs assert a plausible basis for their claims. See Holbrook, 246 F.R.D. at 105-06; Hoffmann, 982 F. Supp. at 262; Cuzco v. Orion Builders, Inc., 477 F. Supp. 2d 628, 633 (S.D.N.Y. 2007).

JPMorgan argues that, because of extensive discovery that has already taken place in this case, the court should assess plaintiffs' Motion as if it were at the second step. The court agrees that it should determine whether to certify this collective action based on the full evidence before it,[5] rather than merely examining the "pleadings and affidavits," as courts do at the first step. See, e.g., Scott v. Aetna Servs., Inc., 210 F.R.D. 261, 264 (D. Conn. 2002).

        a.       Disparate Factual and Employment Settings of Plaintiffs

For certification of a collective action under the FLSA, even at the second stage, "plaintiffs need show only that their positions are similar, not identical, to the positions held by the putative class members." Ayers v. SGS Control Servs., 2007 WL 646326, at *4 (S.D.N.Y. Feb. 26, 2007) (quoting Grayson v. K Mart Corp., 79 F.3d 1086, 1096 (11th Cir.1996). A collective action should be certified if, " 'on balance, the differences among the plaintiffs do not outweigh the similarities in the practices to which they claim to have been subjected.' " Ayers, 2007 WL 646326, at *5 (quoting Wilks v. Pep Boys, 2006 WL 2821700, at *5-6 (M.D.Tenn. Sept. 26, 2006)). The "similarly situated" requirement of the FLSA is "considerably less stringent than the requirement of Fed. R. Civ. P. 23(b)(3) that common questions predominate." See, e.g., Ayers, 2007 WL 646326, at *4 (quoting Rodolico v. Unisys Corp., 199 F.R.D. 468, 481 (E.D.N.Y. 2001)

---

[5] On March 11, 2009, Hendricks moved the court for an extension of time to complete discovery (Doc. No. 49). At that time, the discovery deadline was March 27, 2009. See Report of Rule 26(f) Planning Meeting at 6 (Doc. No. 19). This court granted in part Hendricks's Motion to Extend the Discovery Deadline on March 12, 2009, and the discovery deadline was extended to April 28, 2009 (Doc. No. 50).

       On May 8, 2009, ten days after the April 28 deadline had passed, Hendricks moved for a second extension of time to complete discovery (Doc. No. 54), which JPMorgan opposed (Doc. No. 55). This court granted Hendricks's Second Motion to Extend the Discovery Deadline at a status conference held on May 15, 2009, and the deadline was extended to June 12, 2009 (Doc. No. 57). The plaintiffs never moved to extend the discovery deadline for a third time.

(quotation marks omitted)).

Although the members of the proposed class and the named plaintiffs are grouped together by salary code, the record indicates that the differences among the proposed class members outweigh the similarities. The court bases this determination on the evidence in the record, which includes sworn declarations of members of the putative class, all of which were submitted to the court by JPMorgan.  The court also emphasizes that the analysis contained herein does not address the merits of the claims at issue.  See, e.g., Cuzco v. Orion Builders, Inc., 477 F. Supp. 2d 628, 633 (2007) ("It is not necessary for a court to evaluate the merits of a plaintiff's claims in order to determine that a group of similarly situated persons exists.") (citation omitted). Rather, the court confines itself to an examination of the similarities and differences between the jobs held by the potential class members.

In consideration of the factors discussed herein, the court concludes that the potential class members in this case "hold a wide variety of positions and perform a wide variety of job duties."  Morisky v. Public Service Elec. and Gas Co., 111 F. Supp. 2d 493, 498 (D. N.J. 2000).  Therefore, the proposed class members are not similarly situated.

i.      Supervisory Responsibilities

Hendricks and Minzie claim that they were "low-level functionaries" at JPMorgan who "neither manage[d] nor supervise[d]" other employees.  Mem in Supp. at 9, 18.  In contrast, the record indicates that many potential class members spent a significant amount of time as 502 and/or 601 Fund Accountants supervising lower-level JPMorgan fund accountants.  The fact that some potential FLSA class members (including

11

Hendricks and Minzie) had no supervisory responsibilities over other employees, while many spent significant amounts of time performing tasks such as hiring, interviewing, and reviewing work, strongly bears on the court's conclusion that the members of the proposed class are not similarly situated.

To begin, evidence indicates that members of the proposed class who worked in mutual fund accounting exercised significant supervisory responsibilities over lower-level fund accountants.   See, e.g. DePalo Decl. at ¶ 14 ("Approximately 80% of 502- and 601-level fund accountants in mutual funds supervise an average of four other fund accountants or senior fund accountants.").  Mutual fund accountant Charles Adams, for example, estimated that he spent roughly 75-80% of his time supervising a team of fund accountants who were eligible to receive overtime pay.  Declaration of Charles Adams at ¶ 17.  Adams's duties included "assign[ing] and direct[ing]" the work of lower-level fund accountants; recommending promotions for lower-level fund accountants; preparing performance reviews; reviewing work product; and participating in hiring and interviewing.  Id. at ¶¶ 7, 8, 11, 17.  Daniel Bauer, another mutual fund accountant, estimated that he spent roughly 60% of his time on similar "supervisory duties" over a team of fund accountants who received overtime pay.  Declaration of Daniel Bauer at ¶¶ 4, 21.  Indeed, because "[m]utual funds are very different than hedge funds[6] . . . mutual fund accounting has a very different staffing model than that for Hedge Fund Services . . . [which mutual fund accounting staffing model] relies much more heavily

---

[6] Compared to hedge funds, mutual funds "are more regulated, engage in less complex investments, engage in far more shareholder trades, and their shares are traded daily."  Declaration of James DePalo at ¶ 13.  This means that "accounting for mutual funds is less complex and involves greater volume than for hedge funds."  Id.

12

upon lower-level fund accountants." DePalo Decl. at ¶ 13.

Potential FLSA class members who worked with various other types of fund clients, include pension funds, insurance funds, 401(k) funds, and others (excluding hedge funds), also commonly supervised lower-level fund accountants. James DePalo, JPMorgan's Executive Director for Fund Accounting, estimated that "about 80%" of 502 and 601 Fund Accountants "in these other lines of fund accounting supervise other employees." DePalo Decl. at ¶ 16. Jonathan Ristau, who worked in accounting for pension funds,[7] oversaw four lower-level fund accountants eligible for overtime pay, spending roughly 70% of his time performing supervisory duties. Declaration of Jonathan Ristau at ¶¶ 6, 25. Lobsang Avah, another pension fund accountant, stated that he manages a group of six full time lower-level fund accountants, each of whom is eligible for overtime. Declaration of Lobsang Avah at ¶ 5. Avah states that his supervisory duties, which include "training, coaching, and mentoring," are "the most important part" of his job. Id. at ¶ 8, 16.

Compared to other sectors of JPMorgan's Fund Accounting practice, Hedge Fund Services "has more exempt-level . . . fund accountants who prepare the accounting but may not have supervisory responsibilities." DePalo Decl. at ¶ 15. However, evidence in the record indicates that some 502 and 601 Fund Accountants did, in fact, spend a significant portion of their time exercising supervisory responsibilities over lower-level employees. Brian Henehan, for example, who worked in Hedge Fund Services in Greenwich, stated that he was involved with hiring; prepared

---

[7] Ristau also testified that in addition to pension funds, he worked for a number of "unique funds that relate to the mortgage market." Ristau Decl. at ¶ 6.

performance reviews for lower level fund accountants; assigned work to members of his

team; and recommended members of his teams for promotion.  Declaration of Brian

Henehan at ¶¶ 5, 6, 7, 10.  Cf. Mem. in Supp. at 9 ("Plaintiffs and the members of the

proposed class had a minimal role in supervision and virtually no authority to make or

even recommend employment-related decisions, such as hiring, promoting or firing.").

Richard Kosak, who worked in Hedge Fund Services in Boston, testified that when he

was a  Fund Accounting Analyst, he supervised at least two lower-level fund

accountants at all times, and more commonly supervised 5-6 employees at a time.

Declaration of Richard Kosak at ¶ 2.  Kosak estimated that he spent 75% of his time on

supervisory duties.  Id. at ¶ 18.

These are only a few examples; indeed, various other potential class members

signed declarations describing their significant supervisory responsibilities over lower

level fund accountants.  See, e.g., Declaration of Thomas Chiappini at ¶ 7; Declaration

of Sheila Powers at ¶ 6; Declaration of Magdaline Rodriguez at ¶ 9-11; Declaration of

Hoc Tran at ¶ 4; Declaration of Rumi Usuzawa at ¶ 6; Declaration of Justin Goodman at

¶ 6.  The fact that many of the potential class members in this case spent significant

amounts of time supervising overtime-eligible fund accountants undermines Hendricks'

and Minzie's contention that the potential class members "virtually perform[ed] the

same job functions and responsibilities" as such lower-level fund accountants.  Mem. in

Supp. at 9.  It also strongly bears on the court's determination that the potential class

members are not similarly situated.  Mem. in Supp. at 9.

ii.      Accounting Knowledge

Hendricks and Minzie maintain that their primary "job function" at JPMorgan was

14

"to acquire competency in this various applications of assigned accounting software programs."  Mem. in Supp. at 11.  See also Mem. in Supp. at 12 ("It is not the knowledge of [GAAP], but rather the mastery of JPMorgan's accounting software program applications, that is the primary duty and function of 502/601 Fund Accountants . . . Fund Accountants are not primarily concerned with accounting principles and GAAP.").  By contrast, evidence in the record indicates that in-depth accounting knowledge, including of GAAP, was required to perform the job responsibilities held by many, if not all, potential class members.  See, e.g., DePalo Decl. at ¶ 29 ("Knowledge of GAAP is necessary for many of the positions at the 502 and 601 levels in fund accounting.").  The fact that the potential class members in this case, unlike Hendricks and Minzie, were situated in roles where accounting knowledge was essential, bears on the court's conclusion that the FLSA collective action should not be certified.

For example, Paul Cordasco, a private equity fund accountant who is also a CPA, testified that his "job duties require at least the same level of accounting knowledge as that was required when [he] was in public accounting."  Declaration of Paul Cordasco at ¶ 21; see also id. at ¶ 28 (knowledge of GAAP required).  While Avah, a pension fund accounting supervisor, testified that "the staff accountants need to understand GAAP to some extent," he also stated that he "really ha[s] to know and understand GAAP to be able to perform at the supervisory level."  Avah Decl. at ¶ 18; see also Declaration of Daniel Fromm at ¶ 19 ("I need to know and understand GAAP to perform my job. . . . You could not do this job without advanced accounting knowledge."); Goodman Decl. at ¶ 15 ("Knowledge of [GAAP] has been necessary for

each of my positions at JPMorgan."); Henehan Decl. at ¶ 29; Kosak Decl. at ¶ 16; Malik Decl. at ¶ 14; Declaration of Andrew Parchem at ¶ 15; Saxton Decl. at ¶ 30; Usuzawa Decl. at ¶ 14.  Similarly, Eugene Roemischer stated that "[t]he accounting knowledge I use. . . is as advanced as that used by those who are auditing my work."  Declaration of Eugene Roemischer at ¶ 15; see also Tran Decl. at ¶ 30 ("I use the knowledge I gained during my education in handling the accounting for the funds, including calculating gain and loss and dealing with international exchange rates and derivative instruments.").

Moreover, in contrast to Hendricks and Minzie, members of the proposed class state that they spent relatively little time inputting data and operating computer software programs.  Daniel Bauer, for example, stated that on most days he spends no time "inputting data into the system," and that any inputting that he does have to do takes only a "negligible" amount of time.  Bauer Decl. at ¶ 20.  See also Chiappini Decl. at ¶ 29 ("Inputting data into computer systems or software is a very minimal part of my job").  Brian Henehan, a hedge fund accountant, stated that he spends "less than 5%" of his time inputting information into Geneva, a software program used by Hendricks and Minzie, and that "[e]ven when [he] was a Specialist, [he] only spent 10% of [his] time inputting information into Geneva."  Henehan Decl. at ¶ 29; see also Powers Decl. at ¶ 25 (less than 5% of time spent inputting data); Saxton Decl. at ¶ 28 (less than 20% of time inputting data).

The fact that many potential class members in this case were required to possess in-depth accounting knowledge sharply undermines Hendricks' and Minzie's contentions that "[t]he primary focus of a JPMorgan Fund Accountant's training and job function is to acquire competency in the various applications of assigned accounting

software programs," Mem. in Supp. at 11, and that "[i]t is . . . the mastery of JPMorgan accounting software programs applications, that is the primary duty and function of 502/601 accountants." Id. at 12. It also undermines the notion that Hendricks, Minzie, and other members of the proposed class are similarly situated.

iii.    Other Differences

Various other differences exist between the positions held by members of the proposed class. These differences appear to be largely attributable to the fact that different types of fund accounting clients have different needs and consequently request different types of fund accounting services. As Hendricks and Minzie concede, "the job duties/ responsibilities of 502/601 Fund Accountants may markedly differ and vary by client and/or assigned fund." Mem. in Supp. at 9.[8] What follows is a description of some--but not all--of the differences between the substantive job responsibilities of potential class members in this case. These and other differences inform the court's conclusion that the differences among the potential class members "outweigh the similarities in the practices to which they claim to have been subjected." Ayers, 2007 WL 646326, at *5.

Unlike hedge fund accountants such as Hendricks and Minzie, other potential class members who work in the area of pension funds "supervise the preparation of ERISA compliance reports." DePalo Decl. at ¶ 26. Christina Saxton, unlike Hendricks and Minzie, stated that her job largely consisted of working on matters related to Sarbanes-Oxley compliance. Saxton Decl. at ¶ 8. Saxon and Reddy, unlike Hendricks

---

[8]  Hendricks also wrote an email to this effect. See Def's Exh. EE ("We all are called fund accountant specialist but our functions are different.").

and Minzie, state that they spent time preparing "market risk reports," or "VAR" reports. Saxton Decl. at ¶ 13, Reddy Decl. at ¶ 14.  Cordasco, unlike Hendricks and Minzie, was responsible "for determining the amount of periodic distributions of money by the funds to their partners."  Cordasco Decl. at ¶ 13.  While Hendricks and Minzie worked on preparing "Net Asset Valuation" reports, Adams expressly stated that he does not "determin[e] NAVs."  Adams Decl. at ¶ 20.  While Hendricks and Minzie maintain that they were subject to strict checklists, Avah stated that "[t]here is no 'checklist' that covers [his] supervisory duties," Avah Decl. at ¶ 16.

b.      Potential Defenses

It is clear that JPMorgan will argue that the members of the proposed class are exempt from the FLSA's overtime pay requirements.  That argument, however, goes to the merits of this case.  While the court considers the merits of the underlying claim in ruling on a motion to certify a class under  Fed. R. Civ. P. 23, see infra, section III.B, the court does not consider the merits in an analysis of whether to certify a collective action under the FLSA.  See, e.g., Nerland v. Caribou Coffee Co., 564 F. Supp. 2d 1010, 1021 (D. Minn. 2007) ("On a pending motion for decertification, the Court does not consider whether the named plaintiffs and opt-in plaintiffs would properly be classified as exempt employees.").

c.      Fairness and Procedural Considerations

Because FLSA is a remedial statute, federal courts should give it a liberal construction.  See, e.g., Braunstein v. E. Photographic Labs, 600 F.2d 335 (2d Cir. 1979).  The Supreme Court has held that an FLSA collective action allows plaintiffs to take "advantage of lower individual costs to vindicate rights by the pooling of

18

resources," and allows the judicial system to benefit by "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity."  Hoffmann-La Roche v. Sperling, 493 U.S. 165, 170 (1989).  In this case, however, fairness and procedural considerations do not weigh in favor of certifying the class because the plaintiffs have not shown that the members of the proposed class are similarly situated.  Moreover, unlike in other cases, there are no individuals who have already opted in to this action at this stage.  See, e.g., Perkins v. Southern New England Telephone Co., 2009 WL 3754099, at *7 (D. Conn. 2009) ("Over 60 plaintiffs have already opted in to this action, making a denial of certification difficult on both non-named plaintiffs and SNET, which would have to defend against a large number of individual claims, rather than one collective action.").

> d.    Summary

The sole evidence cited in support of Hendricks' and Minzie's contention that they and the members of the proposed class are similarly situated are statements made by Carolyn Zaletsy, Tunde Reddy, James DePalo, and Melissa Milano, none of whom are potential class members in this case.   JPMorgan states in its Memorandum in Opposition that the plaintiffs "support their sweeping statements about the entire class by citing only to their own testimony about their own employment, or to testimony of individual managers of discrete groups about facts relating only to his or her own group."  Mem. in Opp. at 1.  Indeed, unlike JPMorgan, the plaintiffs offer no deposition testimony or declarations submitted by other members of the potential class.

The evidence submitted by the plaintiffs consists of statements that fund accountants were sometimes moved from department to department to "meet

19

deadlines," that "502/601 Fund Accountants are subject to the same JPMorgan policies, procedures and regulations," that educational requirements are similar across the board, that mutual fund and hedge fund accountants had "the same level of responsibility and decision making," and that certain proposed class members received the same training.  Mem. in Supp. at 14-15.  Hendricks and Minzie have offered no evidence from proposed class members themselves as to the day-to-day nature of their positions.  While the court does not discount the fact that there appear to be *some* similarities in the practices to which Hendricks and Minzie claim the proposed class members were subject, the court concludes that, on balance, the differences substantially outweigh such similiarities.  Because the plaintiffs have failed to show that the proposed members of the FLSA class are "similarly situated," the court concludes that the class should not be certified.

### 3.    Rule 23 Class Certification

Plaintiffs bear the burden of showing that the class they have proposed meets the requirements for class certification. See Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 291 (2d Cir. 1999); Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 484 (2d Cir. 1995). "[T]he preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements."  Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 202 (2d Cir. 2008). A court must "receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met."  In Re Initial Pub. Offerings Secs. Litig., 471 F.3d 24, 41 (2d Cir. 2006) [hereinafter "In Re IPO"].

The Second Circuit has defined the standard that district courts are to use in

deciding whether a plaintiff has met his burden under Rule 23.  In Re IPO, 471 F.3d at

41.  A "district court may not grant class certification without making a determination

that all of the Rule 23 requirements are met."  Id. at 40.  These determinations "can be

made only if the judge resolves factual disputes relevant to each Rule 23 requirement

and finds that whatever underlying facts are relevant to a particular Rule 23

requirement have been established and is persuaded to rule, based on the relevant

facts and the applicable legal standard, that the requirement is met."  Id. at 41. "The

obligation to make such determinations is not lessened by overlap between a Rule 23

requirement and a merits issue, even a merits issue that is identical with a Rule 23

requirement."  Id.

a.     Rule 23(a) requirements

Rule 23(a) of the Federal Rules of Civil Procedure sets forth the following

prerequisites to class certification:

> One or more members of a class may sue or be sued as representative parties
> on behalf of all only if (1) the class is so numerous that joinder of all members is
> impracticable, (2) there are questions of law or fact common to the class, (3) the
> claims or defenses of the representative parties are typical of the claims or
> defenses of the class, and (4) the representative parties will fairly an adequately
> protect the interests of the class.

Fed. R. Civ. P. 23(a).  These requirements are commonly referred to as "numerosity,"

commonality," "typicality," and "adequacy."  See, e.g., Cruz v. Coach Stores, Inc., 202

F.3d 560 (2d Cir. 2000).  JPMorgan maintains that the plaintiffs in this case have failed

to meet each of the four requirements of Rule 23(a).  While the court has doubts as to

whether Hendricks and Minzie meet certain of the requirements of Rule 23(a), the

court need not address whether those requirements are satisfied, because the

21

plaintiffs undoubtedly do not meet the requirements of Fed. R. Civ. P. 23(b).[9]

             **b.**     **Rule 23(b) requirements**

A class must not only meet all Rule 23(a) requirements, but further qualify under one of the three part (b) subdivisions in order to be certified as a class action. Rule 23(b) delineates three types of class actions. The first two subsections of the Rule outline two types of cases in which class certification is especially appropriate: first, in Rule 23(b)(1), where the rights of either potential class members or the party opposing the class would be harmed by piecemeal adjudication, and second, in (b)(2), where the class seeks injunctive or declaratory relief against a party who has itself treated the class as a group in the context of its own acts or admissions. Subsection (b)(3) addresses the residual situation where class adjudication would "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly

---

[9] In particular, the court is concerned that Hendricks and Minzie would be inadequate class representatives, even if the other requirements of Rule 23(a) were met. As the Second Circuit has stated, "to judge the adequacy of representation, courts may consider the honesty and trustworthiness of the named plaintiff." Savino v. Computer Credit, Inc., 164 F.3d 81, 87 (2d Cir. 1998) (citations omitted).

As JPMorgan notes, evidence in the record shows that Hendricks lied on a job application about his employment with JPMorgan and subsequently tried to conceal this lie during discovery. Following his employment with JPMorgan, Hendricks applied for a job at Cannondale Bicycle Corporation, submitting that he earned a salary of $80,000 per year while at JPMorgan. See Defs' Exh. DD at Cannon-13. In fact, Hendricks' salary was $68,000 per year. Following the start of this litigation, Hendricks turned over a copy of his Cannondale job application to the defendants. On that document, the $80,000 figure had been removed. See Defs' Exh. HH. During his deposition, Hendricks admitted to altering his Cannondale employment application prior to turning it over, stating that he made the change "because [he] didn't think it was relevant." Hendricks Dep. at 244. JPMorgan alleges that it "discovered that the document had been falsified only after it received a correct copy from Cannondale itself." Mem. in Opp. at 15.

The court is additionally concerned that Minzie may be an inadequate class representative because he gave inconsistent deposition testimony regarding the circumstances of his termination. Minzie repeatedly testified that he had no knowledge of why his employment with JPMorgan was terminated. See, e.g., Minzie Dep. at 73 ("Q. Do you have any belief about why you were terminated? A. I have no knowledge of why I was"). Later in his deposition, Minzie admitted that he was, in fact, told that the reason for his termination was an "incident" between himself and a coworker. Minzie Dep. at 292-93; Defs' Exh. LL. Moreover, JPMorgan alleges that Minzie falsely represented to a recruiter at another company that he was "laid off," so that he could "hide the reason for his termination." Mem. in Opp. at 15.

situated, without sacrificing procedural fairness or bringing about other undesirable results," but where the circumstances of (b)(1) or (b)(2) are not met.  Rules Advisory Comm. Notes, 39 F.R.D. 69, 102-03 (1966).

The plaintiffs in this case seek class certification under Rule 23(b)(3).  See Mem. in Supp. at 33.  Rule 23(b)(3) contains two prerequisites for certification not imposed on the other two types of Rule 23(b) classes: first, that questions of law or fact common to the members of the class must "predominate" over any questions affecting only individual members, and second, that a class action is "superior" to other available methods for the fair and efficient adjudication of the controversy, to test whether the proposed class is sufficiently cohesive to warrant adjudication by representation.  See Amchem Prod. Inc. v. Windsor, 521 U.S. 591, 623 (1997) (quoting Advisory Comm. Notes).

i.    Predominance

In order to certify a Rule 23(b)(3) class, the court must find "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  The inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem, 521 U.S. at 623. While the commonality inquiry requires only that common questions exist, the predominance inquiry is more difficult to satisfy. See Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002).  Predominance is satisfied only if "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy

23

can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." Id.

   If common issues predominate as to liability, the court should ordinarily find predominance, even if some "individualized damage issues" exist. See In re Visa Check/Mastermoney Antitrust Litig., 280 F.3d 124, 139-40 (2d Cir. 2001).  Together with the superiority requirement, the predominance requirement helps ensure that class certification serves the "economies of time, effort, and expense, . . . [and] uniformity" for which class actions are designed, and avoids "sacrificing procedural fairness or bringing about undesirable results." Amchem, 521 U.S. at 615.  In determining whether the plaintiffs have demonstrated predominance, the court must take into account any rebuttal evidence offered by defendants at the class certification stage.  In re Salomon Analyst Metromedia Litig., 544 F.3d 474, 486 (2d Cir. 2008).

   In this case, it is clear that common questions do not predominate.  As discussed supra, the potential class members in this case "hold a wide variety of positions and perform a wide variety of job duties." Morisky, 111 F. Supp. 2d at 498. The court cannot say with certainty that no member of the proposed class would have an actionable claim for damages under the FLSA.  However, it is very clear, for the reasons stated in this court's analysis of the issue of certification under FLSA, that resolution of the factual questions that have been presented in this case cannot be achieved through generalized proof.  If the court were to certify the class in this case, a ruling on the merits would ultimately boil down to issues related to whether the class members held positions requiring them to, inter alia, supervise other employees and/or

possess accounting knowledge.[10]  Because the differences between the proposed class members' job responsibilities outweigh their similarities, the predominance requirement is not satisfied.

ii.    Superiority

To proceed under Rule 23(b)(3), the court must find that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).   Factors that are relevant to an analysis of the superiority of the class action device include: "the interest of members of the class in individually controlling the prosecution or defense of separate actions; the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; the desirability or undesirability of concentrating the litigation of the claims in the particular forum; the difficulties likely to be encountered in the management of a class action."  In re WorldCom, Inc. Sec. Litig., 219 F.R.D. 267, 304 (S.D.N.Y. 2003) (citing Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 625 (1997)).

While the court need not reach the question of superiority, it is highly doubtful, that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).   Indeed, the fact that the differences among the potential class members in this case outweigh the similarities,

---

[10]  This is because, for example, an employee qualifies for the professional exemption to the FLSA's overtime pay requirement only if his "primary duty is the performance of work . . . [r]equiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction."  29 C.F.R. § 541.300(a)(2)(I).  Indeed, if Hendricks or Minzie was, in fact, a bona fide professional accountant, then there is little doubt that the professional exemption applies as to that plaintiff.  See e.g. 29 C.F.R. § 541.301(e)(5).  Similarly, the administrative exemption to the FLSA's overtime pay requirement applies only to employees "[w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and [w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a).

as stated supra, indicates that concentrating this litigation in this forum will be undesirable, and managing the class action will be quite difficult.

## IV.    CONCLUSION

For the foregoing reasons, the plaintiffs' Second Motion to Amend (Doc. No. 58) is **GRANTED IN PART**, to the extent stated in section II, supra.  The plaintiffs' Motion for FLSA Collective Action and Rule 23 Class Certification (Doc. No. 70) is **DENIED.**


**SO ORDERED.**

Dated at Bridgeport, Connecticut this 15th day of December, 2009.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge